T.C. Memo. 2007-79

UNITED STATES TAX COURT

PATRICK G. & VALERIE V. O'MALLEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23582-04.              Filed April 3, 2007.

<u>Thomas J. Renner</u>, for petitioners.

<u>Chang Teddy Li</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-
ciencies in, and accuracy-related penalties under section
6662(a)[1] on, petitioners' Federal income tax (tax):

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code (Code) in effect for the years at
issue.  All Rule references are to the Tax Court Rules of Prac-
tice and Procedure.

|        |            | Accuracy-Related Penalty |
| Year   | Deficiency | Under Sec. 6662(a)       |
|--------|------------|--------------------------|
| 1999   | $16,654    | $3,331.00                |
| 2000   | 32,677     | 3,517.20                 |

The issues remaining for decision are:

(1) Did petitioners sell certain property on December 2, 1999, for $318,000?  We hold that they did.

(2) Did petitioners sell certain property on June 14, 2000, for $225,000?  We hold that they did not.

(3) Are petitioners liable for each of their taxable years 1999 and 2000 for the accuracy-related penalty under section 6662(a)?  We hold that they are for 1999 and that they are not for 2000.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found except as stated herein.

Petitioners resided in Crownsville, Maryland, at the time they filed the petition in this case.

In 1981, petitioner Patrick G. O'Malley (Mr. O'Malley) received a bachelor of science degree in accounting from the University of Maryland.  After graduating from college, Mr. O'Malley worked for one year for Price Waterhouse.  Shortly after leaving Price Waterhouse, Mr. O'Malley held various jobs in the food service industry.  During 1999 and 2000, the years at issue, Mr. O'Malley operated various businesses, including a consulting

business, an equestrian facility, and a telescope pictures business.

On September 5, 1997, Mr. O'Malley, petitioner Valerie V. O'Malley, and Dorothy Galvin (Ms. Galvin),[2] Mr. O'Malley's mother, purchased for $1,000,000 certain real property located at 1761 Severn Chapel Road, Anne Arundel County, Crownsville, Maryland (Severn Chapel Road property). Farmers and Mechanics Bank (F&M Bank) financed in part the purchase of the Severn Chapel Road property by lending $499,950 to petitioners. F&M Bank held a mortgage on that property with respect to that loan. The sellers of the Severn Chapel Road property financed all but $50 of the balance of the purchase price of that property (petitioners' second loan on the Severn Chapel Road property) and held a second mortgage on that property with respect to that loan.

At the time petitioners purchased the Severn Chapel Road property, that property consisted of approximately 48.5 acres of undivided land on which there were three houses. Around September 1997, petitioners moved into one of the houses located on the Severn Chapel Road property and have lived there at all relevant

---

[2]Although Ms. Galvin was a party to the purchase of the Severn Chapel Road property and various other agreements and transactions into which petitioners entered relating to that property (discussed below), her role as such is not material to our resolution of the issues presented. When discussing any agreements and transactions into which petitioners and Ms. Galvin entered relating to the Severn Chapel Road property, we shall for convenience generally refer only to petitioners, and not to Ms. Galvin.

times.

Shortly after petitioners purchased the Severn Chapel Road property, Mr. O'Malley considered subdividing that property in order to increase its value. To that end, in 1998, petitioners retained Ed Brown & Associates, Inc. (Ed Brown and Associates), a consulting company in land surveying, land planning, and land development. Petitioners asked Ed Brown and Associates to prepare a plan (petitioners' subdivision plan) and a plat (petitioners' subdivision plat) for the subdivision of the Severn Chapel Road property into 13 lots under the family conveyance subdivision provisions of section 4-301 of article 26 of the Anne Arundel County Code (family conveyance subdivision provisions of the Anne Arundel County Code). Around May 1999, Ed Brown and Associates completed its work.

On September 29, 1999, Anne Arundel County approved petitioners' subdivision plan, and petitioners had petitioners' subdivision plat recorded in the land records of Anne Arundel County. Petitioners' subdivision plat provided in pertinent part:

> The family members listed below must retain the lots for a period
> of five (5) years per the notarized and signed intrafamily trans-
> fer declaration of intent on file with planning and code enforce-
> ment and in accordance with article 26, section 304.1(9) and 4-103
> (Bill 33-96)

| Lot | Name | Relationship[3] | Area |
|-----|------|----------------|------|
| 1 | Megan O'Malley | Granddaughter | 2.00 acres |
| 2 | Thomas Galvin | Stepson | 2.09 acres |
| 3 | Dorothy O'Malley Galvin | Self | 2.43 acres |
| 4 | Patrick G. O'Malley | Son | 21.99 acres |
| 5 | Kevin R. O'Malley | Son | 2.04 acres |
| 6 | Bradley Galvin | Grandson | 2.15 acres |
| 7 | Kevin J. O'Malley | Grandson | 2.13 acres |
| 8 | Hannah Galvin | Granddaughter | 2.00 acres |
| 9 | Edward P. O'Malley | Grandson | 2.02 acres |
| 10 | Tara O'Malley | Granddaughter | 2.01 acres |
| 11 | Bonus Lot | N/A | 1.37 acres |
| 12 | Edward P. O'Malley, Jr. | Son | 2.03 acres |
| 13 | Connor O'Malley | Grandson | 2.01 acres |

On October 4, 1999, in conformity with the family conveyance subdivision provisions of the Anne Arundel County Code, petitioners entered into a family conveyance subdivision agreement with Anne Arundel County (petitioners' family subdivision agreement).[4] That agreement provided in pertinent part:

> Subdivider has applied to the County for approval of the family conveyance subdivision (Subdivision) to be known as O'Malley Property Family Conveyance. * * * In order for the County to approve the subdivision, Subdivider is required by Anne Arundel County Code, Article 26.S4-301(a)(4) to enter into an agreement that contains the subdivider's obligations with regard to the Subdivision, is shown on the subdivision plat and is recorded among the Land Records of Anne Arundel

------

[3]The relationships of the individuals listed are their respective relationships to Ms. Galvin.

[4]On Oct. 7, 1999, the family subdivision agreement was recorded in the land records of Anne Arundel County.

County. Therefore, the intent of this Agreement is to give Subdivider the opportunity to comply with the County law an subsequently obtain approval of the Sub-division.

**NOW, THEREFORE, WITNESSETH.** That for and in con-sideration of the natural promises and covenants herein contained, Subdivider and County hereby agree as fol-lows:

1. Subdivider shall convey the lots created in the Subdivision only to the Subdivider's father, mother, son, daughter, stepson, stepdaughter, grandson or granddaughter.

2. After conveyance of a lot to a party listed in paragraph 1 above, the grantee of that lot may not transfer it to a third party for at least five (5) years from the date of final approval of the Subdivi-sion except in the case of severe financial hardship, as determined by the Director of Planning and Code enforcement.

3. The parcel of land, out of which the Subdivi-sion has been created, may not be further subject to a subdivision as a family conveyance.

4. Each lot created in the Subdivision may not be further subject to a family conveyance subdivision.

5. If a lot in the Subdivision is not conveyed to an eligible grantee as set forth in paragraph 1 above, including a custodian under the Uniform Transfers to Minors Act or a trusteeship within two (2) years after final approval of the Subdivision, the final plat or plats for the Subdivision shall be null and void and the subdivider shall conform to the ordinances and regulations in effect at the time or reapplication for any subdivision approval.

6. Subdivider warrants that (a) each grantee of a lot in the Subdivision has not previously been a grantee in any other family conveyance subdivision; and (b) Subdivider has owned the parcel of land out of which the Subdivision is being created since the date of application for subdivision approval and will con-tinue to own it until the subdivision is approved.

7. The Agreement shall (a) run with and bind upon the parcel of land upon which the Subdivision is being created and which is the subject of this Agreement; and (b) inure to the benefit of the parties hereto, their heirs, personal representatives, legal representatives, successors and assigns as appropriate.

8. This Agreement shall be governed by Maryland law and any action brought by or between the parties shall vest jurisdiction and venue exclusively in the courts located in Anne Arundel County.

9. This contains the complete and final Agreement between the parties and no agreement or understanding shall be binding upon any of them unless set forth in writing and executed by both parties. [Reproduced literally.]

All of the lots in petitioners' subdivision plat, including lot 12, were unimproved except for lots 3, 4, and 5.

Lot 5 contained a two-story house that was built in 1996. During September 1997 to December 1999, petitioners rented that lot to Mr. O'Malley's brother Kevin R. O'Malley (Kevin O'Malley) and Kevin O'Malley's spouse Kelly M. O'Malley (Kelly O'Malley), who lived in the house on lot 5 while they were renting that lot from petitioners.

From December 1999 through June 2000, petitioners transferred by deed to the grantees indicated the following lots, inter alia, in petitioners' subdivision plat:[5]

---

[5]As discussed below, petitioners transferred (1) lot 5 to Kevin O'Malley and Kelly O'Malley and (2) lot 12 to Mr. O'Malley's brother Edward P. O'Malley (Edward O'Malley) and Edward O'Malley's spouse Faith M. O'Malley (Faith O'Malley). Petitioners did not transfer lot 4 or lot 11 in petitioners' subdivision plat. Petitioners' subdivision plat showed that Mr. O'Malley was to retain lot 4 and that lot 11 was a "bonus lot".

| Lot | Grantee |
|-----|---------|
| 1   | Patrick O'Malley, Custodian for Megan O'Malley |
| 2   | Thomas Galvin |
| 3   | Patrick O'Malley and Valerie O'Malley |
| 6   | Patrick O'Malley, Custodian for Bradley Galvin |
| 7   | Patrick O'Malley, Custodian for Kevin J. O'Malley |
| 8   | Patrick O'Malley, Custodian for Hanna Galvin |
| 9   | Patrick O'Malley, Custodian for Edward P. O'Malley |
| 10  | Patrick O'Malley, Custodian for Tara O'Malley |
| 13  | Patrick O'Malley, Custodian for Connor O'Malley |

Sometime in the fall of 1999 before December 2, 1999, petitioners concluded that they needed substantial funds to meet certain financial obligations, including certain obligations with respect to petitioners' second loan on the Severn Chapel Road property. Because of the amount of debt that they had outstanding, petitioners were unable to meet such obligations by borrowing additional funds from one or more financial institutions. Mr. O'Malley made a proposal to his brothers Kevin O'Malley and Edward O'Malley (brothers) under which they would accommodate petitioners' financial needs. Mr. O'Malley proposed to his brothers that, as part of petitioners' respective transfers to them of lots 5 and 12 pursuant to petitioners' family subdivision agreement, his brothers obtain loans secured by their respective lots and provide the loan proceeds to petitioners.

Mr. O'Malley made inquiries at F&M Bank in order to ascer-

tain whether his proposal for obtaining funds from his brothers was feasible as far as that bank was concerned.  A mortgage consultant employed by F&M Bank (F&M Bank mortgage consultant) informed Mr. O'Malley that, under F&M Bank's so-called seasoning requirement, F&M Bank would decline to make any loans to his brothers that were to be secured by lots 5 and 12, since those lots did not exist before October 1999, when petitioners' subdivision plat created them.  However, the F&M Bank mortgage consultant advised Mr. O'Malley that if petitioners were to structure as sales the respective transfers to his brothers of lots 5 and 12 pursuant to petitioners' family subdivision agreement, F&M Bank would be willing to make loans to those brothers and secure any such loans by those respective lots.

In order to enable petitioners to obtain funds that they needed, on December 2, 1999, petitioners executed a deed (December 2, 1999 deed) under which they transferred lot 5 to Kevin O'Malley and his spouse Kelly O'Malley.[6]  That deed provided in pertinent part:

> WITNESSETH, That in consideration of the sum of THREE
> HUNDRED EIGHTEEN THOUSAND DOLLARS and 00/100
> ($318,000.00),[7] which includes the amount of any out-

---

[6]Although Kelly O'Malley was a party to the December 2, 1999 transaction, her role as such is not material to a resolution of the issues presented.  When discussing the December 2, 1999 transaction, we shall for convenience refer only to Kevin O'Malley, and not to Kelly O'Malley.

[7]On Nov. 4, 1999, an appraiser signed an appraisal in which
(continued...)

standing Mortgage or Deed of Trust, if any, the receipt whereof is hereby acknowledged, the said GRANTOR [petitioners] does grant and convey to the said Kevin R. O'Malley and Kelly M. O'Malley, husband and wife, as tenants by the entirety, their heirs, personal representatives and assigns, in fee simple, all that lot of ground situate in Anne Arundel County, Maryland and described as follows, that is to say [lot 5] * * *

On December 16, 1999, the December 2, 1999 deed was recorded in the land records of Anne Arundel County.

On December 2, 1999, Kevin O'Malley borrowed $254,400 from F&M Bank ($254,400 F&M Bank 1999 loan) and $47,700 from petitioners (second loan with respect to lot 5).[8]  On the same date, Kevin O'Malley transferred to petitioners all but $3,498 of the $254,400 F&M Bank 1999 loan proceeds, or $250,902.[9]

On December 2, 1999, Kevin O'Malley executed a deed of trust (December 2, 1999 deed of trust) with respect to lot 5 to secure the $254,400 F&M Bank 1999 loan.  The December 2, 1999 deed of

_____

[7](...continued)
the appraiser estimated the fair market value of lot 5 to be $318,000.

[8]The parties stipulated that the second loan with respect to lot 5 was in the amount of $47,000, and not $47,700.  That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The record establishes, and we have found, that the second loan with respect to lot 5 was in the amount of $47,700.

[9]As shown below in the settlement statement prepared with respect to the events that took place on Dec. 2, 1999, petitioners were responsible for settlement charges totaling $3,498, see infra note 11, which reduced the amount of the $254,400 F&M Bank 1999 loan proceeds that was transferred to petitioners on that date.  As also shown below in that statement, petitioners were responsible for paying $15,900 of closing costs.

trust provided in pertinent part:

> Borrower [Kevin O'Malley] owes Lender [F&M Bank] the principal sum of Two Hundred Fifty Four Thousand Four hundred and no/100 Dollars (U.S. $254,400.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on January 1, 2030. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in Anne Arundel County, Maryland * * * [Lot 5].

On December 16, 1999, the December 2, 1999 deed of trust was recorded in the land records of Anne Arundel County.

We shall refer to the above-described events occurring on December 2, 1999, as the December 2, 1999 transaction.

Page 1 of a U.S. Department of Housing and Urban Development (HUD) settlement statement (December 2, 1999 settlement statement) prepared with respect to the December 2, 1999 transaction showed the following entries:

D. NAME OF BORROWER:     Kevin R. O'Malley and Kelly M. O'Malley

       *    *    *    *    *    *    *

E. NAME OF SELLER:     Patrick G. O'Malley and Valerie V. O'Malley
Dorothy O'Malley Galvin

       *    *    *    *    *    *    *

F. NAME OF LENDER:     Farmers & Mechanics National Bank
  ADDRESS:     9337 Liberty Road, Randallstown, MD 21133

G. PROPERTY ADDRESS:     1104 Abbington Farm Road, Crownsville, MD 21032

H. SETTLEMENT AGENT:     Mid-Maryland Title Company, Inc.
  PLACE OF SETTLEMENT:  900 Bestgate Road, Suite 104, Annapolis, MD 21401

I. SETTLEMENT DATE:     12/02/99

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract sales price | 318,000.00 | 401. Contract sales price | 318,000.00 |
| * * * * | | * * * | |
| 103. Settlement charges to borrower (line 1400)[10] * * * | 11,665.26 | | |
| * * * * | | * * * | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 329,665.26 | 420. GROSS AMOUNT DUE TO SELLER: | 318,000.00 |
| 200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| * * * * | | * * * | |
| 202. Principal Amount of new loans | 254,400.00 | 502. Settlement charges to seller (line 1400)[11] | 3,498.00 |
| * * * * | | * * * | |
| 206. Second Mortgage from Seller | 47,700.00 | 506. Second Mortgage from Seller | 47,700.00 |
| 207. Closing Costs paid by Seller | 15,900.00 | 507. Closing Costs paid by Seller | 15,900.00 |
| * * * * | | * * * | |
| 220. TOTAL PAID BY/FOR BORROWER | 318,000.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 67,098.00 |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 329,665.26 | 601. Gross amount due to seller (line 420) | 318,000.00 |
| 302. Less amounts paid by/for borrower(line 220) | 318,000.00 | 602. Less reduction amount due seller (line 520) | 67,098.00 |
| 303. CASH FROM BORROWER | 11,665.26 | 603. CASH TO SELLER | 250,902.00 |

Page 1 of the December 2, 1999 settlement statement also stated:

---

[10]Line 1400 on page 2 of the December 2, 1999 settlement statement showed settlement charges to borrower of $11,665.26 consisting of $3,459.75 of fees and $1,437.53 of prepaid interest with respect to the $254,400 F&M Bank 1999 loan, $2,385.04 of county property taxes, $1,605 of title charges, $2,778 of government recording and transfer charges, and a downward adjustment of six cents for an aggregate analysis adjustment to F&M Bank.

[11]Line 1400 on page 2 of the December 2, 1999 settlement statement showed settlement charges to seller of $3,498 consisting of $1,113 of State recordation tax, $795 of State transfer tax, and $1,590 of county transfer tax.

WARNING:  It is a crime to knowingly make false state-
ments to the United States on this or any other similar
form.  Penalties upon conviction can include a fine and
imprisonment.  For details see:  Title 18 U.S. Code
Section 1001 and Section 1010.

 *  *  *  *  *  *  *

SUBSTITUTE FORM 1099 SELLER STATEMENT:  The information
contained herein is important tax information and is
being furnished to the Internal Revenue Service.  If
you are required to file a return, a negligence penalty
or other sanction will be imposed on you if this item
is required to be reported and the IRS determines that
it has not been reported.  The Contract Sales Price
described on line 401 above constitutes the Gross Pro-
ceeds of this transaction.

SELLER INSTRUCTIONS:  If this real estate was your
principal residence, file Form 2119, Sale or Exchange
of Principal Residence, for any gain, with your income
tax return; for other transactions, complete the appli-
cable parts of Form 4797.  Form 6252 and/or Schedule D
(Form 1040).

Attached to the December 2, 1999 settlement statement was a

document entitled "ACKNOWLEDGEMENT AND RECEIPT OF SETTLEMENT

STATEMENT", which petitioners and Kevin O'Malley signed.  That

document provided in pertinent part:

We, the undersigned SELLER(S), BUYER(S) and CLOSING
AGENT do hereby acknowledge and agree that:

1.  BUYER(S) acknowledge receipt and disbursement on
his behalf of the loan proceeds in full and SELLER(S)
acknowledge payment in full of the proceeds due
SELLER(S) from the settlement, as shown on Line 603.

 *  *  *  *  *  *  *

SELLER(S) further acknowledge that receipt of a
copy hereof shall constitute a receipt at closing of
IRS Form 1099-S [Proceeds From Real Estate Transac-
tions].

> I have carefully reviewed the HUD-1 Settlement State-
> ment and to the best of my knowledge and belief, it is
> a true and accurate statement of all receipts and dis-
> bursements made on my account or by me in this transac-
> tion.  I further certify that I have received a copy of
> the HUD-1 Settlement Statement.

A settlement agent for the December 2, 1999 transaction issued Form 1099-S, Proceeds From Real Estate Transactions (Form 1099-S), which reported that transaction as a sale at a gross sales price of $318,000.

At all relevant times after the December 2, 1999 transaction, (1) Kevin O'Malley (a) continued to live in the house located on lot 5, (b) ceased paying rent to petitioners with respect to that lot, and (c) made payments to F&M Bank with respect to the $254,400 F&M Bank 1999 loan; and (2) petitioners did not make any payments to F&M Bank with respect to that loan.

During February 2000 to November 2001, petitioners issued the following checks totaling $7,407.40 to Kevin O'Malley:

| Date of Check | Check Number | Amount |
|---|---|---|
| 2/17/00 | [1]2459 | $357.37 |
| 2/17/00 | [2]2460 | 357.37 |
| 4/12/00 | [3]2495 | 357.37 |
| 4/20/00 | [3]2498 | 357.37 |
| 6/23/00 | [3]2531 | 714.74 |
| 10/23/00 | 2098 | 1,429.48 |
| 12/2/00 | 2626 | 357.37 |
| 12/10/00 | 2055 | 70.00 |
| 1/22/01 | 2674 | 322.37 |
| 3/9/01 | 2709 | 939.74 |
| 6/8/01 | 2792 | 357.37 |
| 8/23/01 | 2845 | 1,072.11 |
| 11/02/01 | 2950 | 714.74 |

[1]The notation "Feb 00" appeared at the bottom of check No. 2459.
[2]The notation "March 00" appeared at the bottom of check No. 2460.
[3]The notation "April 00" appeared at the bottom of each of check Nos. 2495, 2498, and 2531.

Petitioners issued a $54,400 check dated June 3, 2003, to Kevin O'Malley. A notation at the bottom of that check stated: "Loan Repayment".

Sometime between December 2, 1999, and September 14, 2004, petitioners forgave the second loan with respect to lot 5.

Although the funds that petitioners received from Kevin O'Malley as a result of the December 2, 1999 transaction enabled them to satisfy certain of their financial obligations, they needed additional funds in order to meet certain other obligations. Mr. O'Malley asked his brother Edward O'Malley whether he would be willing to accommodate petitioners and enable them to obtain such additional funds. Edward O'Malley agreed to do so. To that end, Edward O'Malley and Mr. O'Malley entered into an oral agreement (agreement between Edward O'Malley and Mr. O'Mal-

ley) under which: (1) Petitioners' transfer of lot 12 to Edward O'Malley pursuant to petitioners' family subdivision agreement was to be structured in the form of a sale;[12] (2) Edward O'Malley was to borrow from F&M Bank $180,000 ($180,000 loan), or 80 percent of the estimated $225,000 fair market value of lot 12,[13] and was to secure that loan with that lot; (3) Edward O'Malley was to transfer proceeds of the $180,000 loan to petitioners; (4) petitioners were to make all the payments to F&M Bank required by the terms of the $180,000 loan; (5) the balance of the estimated $225,000 fair market value of lot 12 (i.e., $45,000) was to be reflected as a loan from petitioners to Edward O'Malley on which Edward O'Malley was not required to make any payments; (6) petitioners were to pay all the expenses relating to lot 12, including all real property taxes; and (7) Edward O'Malley was to retransfer lot 12 to petitioners after a five-year period.

On June 14, 2000, pursuant to the agreement between Edward O'Malley and Mr. O'Malley, petitioners executed a deed (June 14, 2000 deed) under which they transferred lot 12 to Edward O'Malley

---

[12]Edward O'Malley and Mr. O'Malley agreed to structure the transfer of lot 12 as a sale because F&M Bank required such a structure before it was willing to make a loan to Edward O'Malley that was to be secured by that lot.

[13]An appraiser for F&M Bank estimated the value of lot 12 to be $225,000.

and his wife Faith O'Malley.[14]  That deed provided in pertinent part:

> WITNESSETH, That in consideration of the sum of TWO HUNDRED TWENTY FIVE THOUSAND DOLLARS and 00/100 ($225,000.00), which includes the amount of any out-standing Mortgage or Deed of Trust, if any, the receipt whereof is hereby acknowledged, the said GRANTOR [peti-tioners] does grant and convey to the said Edward P. O'Malley and Faith M. O'Malley, husband and wife, as tenants by the entirety their heirs, personal represen-tatives and assigns, in fee simple, all that lot of ground situate in Anne Arundel County, Maryland and described as follows, that is to say [lot 12] * * *

On June 30, 2000, the June 14, 2000 deed was recorded in the land records of Anne Arundel County.

On June 14, 2000, pursuant to the agreement between Edward O'Malley and Mr. O'Malley, Edward O'Malley borrowed $180,000 from F&M Bank ($180,000 F&M Bank 2000 loan).  On the same date, Edward O'Malley transferred to petitioners all but $8,475 of the $180,000 F&M Bank 2000 loan, or $171,525.[15]

On June 14, 2000, pursuant to the agreement between Edward O'Malley and Mr. O'Malley, Edward O'Malley executed a deed of

---

[14]Although Faith O'Malley was a party to the various agree-ments into which Edward O'Malley entered relating to lot 12, her role as such is not material to our resolution of the issues presented.  When discussing the June 14, 2000 transaction, we shall for convenience refer only to Edward O'Malley, and not to Faith O'Malley.

[15]As shown below in the settlement statement prepared with respect to the events that took place on June 14, 2000, petition-ers were responsible for settlement charges of $2,475 and costs of $6,000, the total of which charges and costs reduced the amount of the $180,000 F&M Bank 2000 loan proceeds that was transferred to petitioners on that date.

trust (June 14, 2000 deed of trust) with respect to lot 12 to secure the $180,000 F&M Bank 2000 loan.  The June 14, 2000 deed of trust provided in pertinent part:

> Borrower [Edward O'Malley] owes Lender [F&M Bank] the principal sum of One Hundred Eighty Thousand and no/100 Dollars * * *.  This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on July 1, 2003.  This Security Instrument secures to Lender:  (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agree-ments.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property [lot number twelve] * * *.

On a date not disclosed by the record, the June 14, 2000 deed of trust was recorded in the land records of Anne Arundel County.

We shall refer to the above-described events occurring on June 14, 2000, as the June 14, 2000 transaction.

Page 1 of a HUD settlement statement (June 14, 2000 settle-ment statement) prepared with respect to the June 14, 2000 trans-action showed the following entries:

```
D. NAME OF BORROWER:        Edward P. O'Malley and Faith M. O'Malley
   ADDRESS:                 1105 Abbington Farm Road, Crownsville, MD 21032
E. NAME OF SELLER:          Patrick G. O'Malley and Valerie V. O'Malley
                            Dorothy Galvin

                    *    *    *    *    *    *    *

F. NAME OF LENDER:          Farmers & Mechanics National Bank
   ADDRESS:                 110 Thomas Johnson Drive, Frederick, MD 21705

G. PROPERTY ADDRESS:        1105 Abbington Farm Road, Crownsville, MD 21032

H. SETTLEMENT AGENT:        Mid-Maryland Title Company, Inc.
   PLACE OF SETTLEMENT:     900 Bestgate Road, Suite 104, Annapolis, MD 21401

I. SETTLEMENT DATE:         06/14/2000
```

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract sales price | 225,000.00 | 401. Contract sales price | 225,000.00 |
| * * * * | | * * * | |
| 103. Settlement charges to borrower (line 1400)[16] * * * | 7,327.71 | | |
| * * * * | | * * * | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 232,327.71 | 420. GROSS AMOUNT DUE TO SELLER: | 225,000.00 |
| 200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| * * * * | | * * * | |
| 202. Principal amount of new loan(s) | 180,000.00 | 502. Settlement charges to seller (line 1400)[17] | 2,475.00 |
| * * * * | | * * * | |
| 206. Seller Financing | 45,000.00 | 506. Seller Financing | 45,000.00 |
| 207. Costs paid by seller | 6,000.00 | 507. Costs paid by seller | 6,000.00 |
| * * * * | | * * * | |
| 220. TOTAL PAID BY/FOR BORROWER | 231,000.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 53,475.00 |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 232,327.71 | 601. Gross amount due to seller (line 420) | 225,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | 231,000.00 | 602. Less reduction amount due seller (line 520) | 53,475.00 |
| 303. CASH FROM BORROWER | 1,327.71 | 603. CASH TO SELLER | 171,525.00 |

Page 1 of the June 14, 2000 settlement statement also stated:

> WARNING:  It is a crime to knowingly make false state-
> ments to the United States on this or any other similar
> form.  Penalties upon conviction can include a fine and

---

[16] Line 1400 on page 2 of the June 14, 2000 settlement statement showed settlement charges to borrower of $7,327.71 consisting of $2,350 of fees and $607.81 of prepaid interest with respect to the $180,000 F&M Bank 2000 loan, $1,501 of title charges, $2,550 of government recording and transfer charges, and $318.90 of additional settlement charges.

[17] Line 1400 on page 2 of the June 14, 2000 settlement statement showed settlement charges to seller of $2,475 consisting of $787.50 of State recordation tax, $562.50 of State transfer tax, and $1,125 of county transfer tax.

imprisonment.  For details see:  Title 18 U.S. Code
Section 1001 and Section 1010.

      *        *        *        *        *        *        *

SUBSTITUTE FORM 1099 SELLER STATEMENT:  The information
contained herein is important tax information and is
being furnished to the Internal Revenue Service.  If
you are required to file a return, a negligence penalty
or other sanction will be imposed on you if this item
is required to be reported and the IRS determines that
it has not been reported.  The Contract Sales Price
described on line 401 above constitutes the Gross Pro-
ceeds of this transaction.

SELLER INSTRUCTIONS:  If this real estate was your
principal residence, file Form 2119, Sale or Exchange
of Principal Residence, for any gain, with your income
tax return; for other transactions, complete the appli-
cable parts of Form 4797, Form 6252 and/or Schedule D
(Form 1040).

A settlement agent for the June 14, 2000 transaction issued Form 1099-S, which reported that transaction as a sale at a gross sales price of $225,000.

As reflected in the terms of the $180,000 F&M Bank 2000 loan and the June 14, 2000 deed of trust, the $180,000 F&M Bank 2000 loan was due and payable in full on July 1, 2003.  In order to repay that loan, Edward O'Malley and Mr. O'Malley agreed that Edward O'Malley was to refinance it, which he did around July 1, 2003 (refinanced F&M Bank 2000 loan).  The refinanced F&M Bank 2000 loan was secured by lot 12, was due and payable in full on a date not disclosed by the record in August 2006, and bore an interest rate that was lower than the interest rate on the $180,000 F&M Bank 2000 loan.  Because the refinanced F&M Bank

2000 loan was not payable in full until August 2006, Edward O'Malley and Mr. O'Malley agreed that Edward O'Malley was not to retransfer lot 12 to petitioners in June 2005, as contemplated by the agreement between Edward O'Malley and Mr. O'Malley. Instead, they agreed that Edward O'Malley was to retransfer that lot to petitioners when the refinanced F&M Bank 2000 loan was paid in full.

Pursuant to the agreement between Edward O'Malley and Mr. O'Malley, as modified by them when Edward O'Malley agreed to refinance the $180,000 F&M Bank 2000 loan, petitioners made from July 2000 through December 2005 the following payments totaling $69,538.49 to F&M Bank on the $180,000 F&M Bank 2000 loan or the refinanced F&M Bank 2000 loan:[18]

---

[18]Petitioners maintained at least two checking accounts with Bank of America (petitioners' Bank of America checking accounts) from which petitioners made payments to F&M Bank on the $180,000 F&M Bank 2000 loan or the refinanced F&M Bank 2000 loan.

| Date[1] | Check Number | Amount[2] |
|---|---|---|
| 7/21/00 | 2540 | 1,227.92 |
| 8/29/00 | 2573 | 1,227.92 |
| 9/22/00 | 2596 | 1,227.92 |
| 11/6/00 | 2612 | 1,227.92 |
| 12/8/00 | 2633 | 1,227.92 |
| 1/5/01 | 2660 | 1,227.92 |
| 2/9/01 | 2680 | 1,227.92 |
| 3/22/01 | 2726 | 1,289.31 |
| 3/22/01 | 2727 | 1,227.92 |
| 4/30/01 | 2764 | 1,227.92 |
| 6/8/01 | 2789 | 1,227.92 |
| 7/2/01 | 2826 | 1,289.31 |
| 8/12/01 | 3437 | 1,227.92 |
| 9/1/01 | 2915 | 1,227.92 |
| 10/12/01 | 3470 | 1,227.92 |
| 12/11/01 | 2987 | 1,227.92 |
| 1/4/02 | 3533 | 1,227.92 |
| 2/5/02 | 5018 | 1,227.92 |
| 2/28/02 | 5082 | 1,228.92 |
| 3/29/02 | – | 1,289.31 |
| 5/09/02 | 8006 | 1,289.31 |
| 6/21/02 | [3]1097 | 1,232.92 |
| 7/5/02 | 8057 | 1,227.92 |
| 8/9/02 | 3576 | 1,227.92 |
| 9/16/02 | 8070 | 1,232.92 |
| 10/10/02 | 3591 | 1,227.92 |
| 11/1/02 | 3616 | 1,227.92 |
| 12/20/02 | 3643 | 1,294.31 |
| 1/10/03 | 3662 | 1,227.92 |
| 2/6/03 | 3678 | 1,227.92 |
| 3/4/03 | 3711 | 1,227.92 |
| 3/25/03 | 3728 | 1,227.92 |
| 5/15/03 | 3593 | 1,232.92 |
| 6/13/03 | 3758 | 1,232.92 |
| 7/3/03 | 3784 | 1,227.92 |
| 7/29/03 | 3796 | 1,227.92 |
| 10/10/03 | 3837 | 966.32 |
| 11/10/03 | 3847 | 920.31 |
| 12/15/03 | [3]3866 | 1,845.65 |
| 2/17/04 | [3]3887 | 1,891.63 |
| 4/10/04 | 3933 | 920.31 |
| 5/12/04 | 3948 | 920.31 |
| 5/18/04 | 3956 | 925.31 |
| 7/10/04 | 3970 | 920.31 |
| 8/6/04 | 3991 | 920.31 |

| 9/16/04 | 5140 | 925.31 |
| 10/12/04 | 1540 | 1,855.62 |
| 12/17/04 | 5145 | 1,845.62 |
| 2/1/05 | 6015 | 920.31 |
| 3/11/05 | 1000 | 925.31 |
| 3/26/05 | 6028 | 920.31 |
| 5/13/05 | 6034 | 925.31 |
| 6/4/05 | 6045 | 920.31 |
| 7/18/05 | 1001 | 1,845.62 |
| 9/13/05 | – | 925.31 |
| 10/8/05 | 6119 | 920.31 |
| 11/4/05 | 6133 | 920.31 |
| 12/2/05 | 6145 | 920.31 |

[1]In the case of payments evidenced by petitioners' checks, the dates indicated are the dates of the respective checks. In the case of payments evidenced by petitioners' bank statements, the dates indicated are the dates reflected on such respective statements.

[2]Except for the reduced payments attributable to the refinanced F&M Bank 2000 loan, the record is not altogether clear why the amounts of the payments that petitioners made to F&M Bank varied at times. However, it appears that certain payments that petitioners made to F&M Bank were increased to reflect additional interest and/or late charges with respect to the $180,000 F&M Bank 2000 loan or the refinanced F&M Bank 2000 loan that F&M Bank imposed because of late payments by petitioners. It also appears that petitioners intended that certain payments that they made on the refinanced F&M Bank 2000 loan, which were in amounts that are approximately twice as much as the amounts of the other payments that they generally made, were to be applied as payments on that loan for the month of the date of the check and the following month.

[3]Check Nos. 1097, 3866, and 3887 were issued by a process known as "Pay by check over the phone Western Union phone pay". Edward O'Malley's name appeared both in the upper left hand corner and the signature line of each of those checks. However, the payment on each of those checks was drawn from one of petitioners' Bank of America checking accounts.

Pursuant to the agreement between Edward O'Malley and Mr. O'Malley, as modified by them when Edward O'Malley agreed to refinance the $180,000 F&M Bank 2000 loan: (1) From June 14, 2000, until at least the time of the trial in this case in early 2006, Edward O'Malley did not (a) make any payments to F&M Bank on the $180,000 F&M Bank 2000 loan or the refinanced F&M Bank 2000 loan, (b) make any payments on the second loan with respect

to lot 12, or (c) live on lot 12;[19] (2) petitioners paid all the expenses relating to lot 12, including all real property taxes; and (3) sometime after June 14, 2000, and before September 15, 2004, petitioners forgave the second loan with respect to lot 12.

Petitioners timely filed Form 1040, U.S. Individual Income Tax Return, for each of their taxable years 1999 and 2000, which their return preparer prepared. Prior to filing their 1999 return, petitioners did not consult a professional with respect to the tax treatment of the December 2, 1999 transaction. Nor did they consult a professional with respect to the tax treatment of the June 14, 2000 transaction before they filed their 2000 return. Petitioners did not report the December 2, 1999 transaction in their 1999 return. Nor did they report the June 14, 2000 transaction in their 2000 return.

Respondent issued to petitioners a notice of deficiency (notice) with respect to their taxable years 1999 and 2000. In that notice, respondent determined, inter alia, that the December 2, 1999 transaction and the June 14, 2000 transaction constitute sales by petitioners of lots 5 and 12, respectively. Consequently, respondent determined in the notice to increase petitioners' taxable income for each of their taxable years 1999 and

[19]As discussed above, at the time petitioners' subdivision plat was recorded in the land records of Anne Arundel County, lot 12 was unimproved. Although not altogether clear from the record, it appears that lot 12 remained unimproved at all relevant times.

2000.  The notice contained the following computations of such

increases:

1999 Sale of Lot 5

| | | |
|---|---|---|
| Contract price | 318,000 | |
| Reduction | (47,700) | §108(e)(5)[20] |
| Selling costs | (19,398) | |
| Selling price | 250,902 | |
| Basis | (119,425) | |
| **Gain** | **$ 131,477.00**[21] | |

2000 Sale of Lot 12

| | | |
|---|---|---|
| Contract price | 225,000 | |
| Reduction | (45,000) | §108(e)(5)[22] |
| Selling costs | (8,475) | |
| Selling price | 171,525 | |
| Basis | (54,361) | |
| **Gain** | **$ 117,164.36**[23] | |

[Reproduced literally.]

Respondent further determined in the notice that petitioners are

liable for each of their taxable years 1999 and 2000 for the

---

[20]Respondent made the $47,700 adjustment under sec. 108(e)(5) to reflect that petitioners forgave the second loan with respect to lot 5.

[21]The parties agree that if the Court were to sustain respondent's determination that the December 2, 1999 transaction constitutes a sale of lot 5 by petitioners, the gain resulting from that sale must be calculated by using the correct amount of petitioners' adjusted basis in that lot, i.e., $168,494.

[22]Respondent made the $45,000 adjustment under sec. 108(e)(5) to reflect that petitioners forgave the second loan with respect to lot 12.

[23]The parties agree that if the Court were to sustain respondent's determination that the June 14, 2000 transaction constitutes a sale of lot 12 by petitioners, the gain resulting from that sale must be calculated by using the correct amount of petitioners' adjusted basis in that lot, i.e., $52,466.

accuracy-related penalty under section 6662(a).[24]

OPINION

Petitioners bear the burden of proving that respondent erred in making the determinations in the notice that remain for our consideration.[25]  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  We address below the standard of proof required of petitioners in order to satisfy that burden with respect to the December 2, 1999 transaction and the June 14, 2000 transaction.

Before considering the December 2, 1999 transaction and the June 14, 2000 transaction, we shall (1) summarize certain principles applicable in determining whether those transactions constitute sales for tax purposes by petitioners of lots 5 and 12 and (2) evaluate certain evidence in the record on which petitioners rely.

<u>Certain Applicable Principles</u>

The determination of whether a purported sale is a sale for tax purposes is a factual determination, <u>Derr v. Commissioner</u>, 77

---

[24]Respondent made certain additional determinations in the notice with respect to petitioners' taxable year 1999 that petitioners do not dispute.  Certain of those determinations were favorable to petitioners, and certain others were unfavorable.  In addition, respondent made certain additional determinations in the notice with respect to petitioners' taxable years 1999 and 2000, the resolution of which flows automatically from the resolution of certain other determinations in the notice.

[25]Petitioners do not claim that the burden of proof shifts to respondent under sec. 7491(a).  We conclude that the burden of proof does not shift to respondent under that section.

T.C. 708, 724 (1981), that must be made as of the date of the purported sale, see id. at 723-724.[26]  In Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981), we held:

> The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed * * *.  This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances.  Some of the factors which have been considered by courts in making this determination are: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * *  [Fn. refs. and citations omitted.]

The Court applies the so-called strong proof rule where a taxpayer asserts, as petitioners do here, that a transaction that is in form a sale of property is not a sale for tax purposes. See Ill. Power Co. v. Commissioner, 87 T.C. 1417, 1434 (1986); Coleman v. Commissioner, 87 T.C. 178, 204 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987).  Under the strong proof rule, a taxpayer must present strong proof, i.e., more than a preponderance of the evidence, for the Court to disregard the form in which the taxpayer cast a transaction.  See Ill. Power

---

[26]See also Siegel v. Commissioner, T.C. Memo. 1985-441; Hunter v. Commissioner, T.C. Memo. 1982-126.

Co. v. Commissioner, supra; Coleman v. Commissioner, supra. The United States Court of Appeals for the Fourth Circuit to which an appeal in this case would normally lie requires application of the strong proof rule where a taxpayer attempts to disregard the form of a transaction as not reflective of its substance. In an unpublished opinion, Estate of Hoffman v. Commissioner, 8 Fed. Appx. 262, 266 n.2 (4th Cir. 2001), that Court of Appeals observed: "Taxpayers who seek to elevate substance over form must present 'strong proof,' a burden which is greater than a preponderance of the evidence."

Applying the foregoing principles to the instant case, petitioners must show by strong proof that the benefits and burdens of ownership of lots 5 and 12 did not pass to Kevin O'Malley and Edward O'Malley, respectively, in order to sustain their position that the December 2, 1999 transaction and the June 14, 2000 transaction do not constitute sales for tax purposes.

Evaluation of Certain Evidence on Which Petitioners Rely

Petitioners rely on certain testimonial and documentary evidence in order to satisfy their burden of proof. The testimonial evidence on which petitioners rely is the testimony of Mr. O'Malley and Edward O'Malley. We found both Mr. O'Malley and Edward O'Malley to be credible. As discussed below, we also found certain of Mr. O'Malley's testimony regarding the December 2, 1999 transaction to be general, vague, conclusory, and/or

incomplete.  The documentary evidence on which petitioners rely includes certain checks payable to F&M Bank and certain F&M Bank statements.  We found that evidence to be credible.

December 2, 1999 Transaction

It was petitioners' position at the time they filed their 1999 return that the December 2, 1999 transaction did not constitute a sale of lot 5 when it occurred.  Consequently, they did not report that transaction as a sale in that return.  Petitioners maintained at trial, and continue to maintain on brief, the same position that they took in their 1999 return.  However, petitioners argued at trial, and continue to argue on brief, that, because of events occurring in years after the December 2, 1999 transaction, that transaction became a sale of lot 5 in 1999, but for $200,000 and not for $318,000 as reflected in the December 2, 1999 settlement statement.

We address first petitioners' position that the December 2, 1999 transaction did not constitute a sale of lot 5 when it occurred.  According to petitioners, the record establishes that that transaction was some type of venture with respect to lot 5 between Mr. O'Malley and Kevin O'Malley (alleged venture).  Petitioners contend that, pursuant to that alleged venture, (1) at the time of the December 2, 1999 transaction, Kevin O'Malley was to (a) borrow $254,400 from F&M Bank and secure that loan with lot 5, (b) contribute $200,000 of the proceeds of the

$254,400 F&M Bank 1999 loan to the alleged venture (alleged $200,000 contribution), and (c) lend $54,400 of the $254,400 F&M Bank 1999 loan to petitioners (purported $54,400 loan); and (2) sometime after the December 2, 1999 transaction, (a) Kevin O'Malley was to contribute an additional $100,000 to the alleged venture (additional $100,000 contribution),[27] and Mr. O'Malley was to contribute the same amount to the alleged venture. Petitioners also contend that on June 3, 2003, they repaid Kevin O'Malley the purported $54,400 loan.

In support of petitioners' contentions with respect to the alleged venture, including the purported $54,400 loan, petitioners rely on the testimony of Mr. O'Malley and certain checks that petitioners issued to Kevin O'Malley about which Mr. O'Malley testified. We found that testimony of Mr. O'Malley to be general, vague, conclusory, and/or incomplete, and we shall not rely on that testimony to establish petitioners' contentions as to that alleged venture. To illustrate, Mr. O'Malley's testimony was general, vague, conclusory, and incomplete regarding Kevin O'Malley's alleged $200,000 contribution to the alleged venture. The December 2, 1999 settlement statement showed $250,902 of the proceeds of the $254,400 F&M Bank 1999 loan as "CASH TO SELLER

---

[27]According to petitioners, petitioners were to repay the purported $54,400 loan to Kevin O'Malley at the time Kevin O'Malley was to make his additional $100,000 contribution to the alleged venture, and Kevin O'Malley was to use such funds, as well as additional funds, to make that contribution.

[petitioners]".  Mr. O'Malley's testimony does not explain why and how petitioners received those loan proceeds if, as petitioners contend, Kevin O'Malley was to, and did, contribute $200,000 of such proceeds to the alleged venture.[28]  By way of further illustration, Mr. O'Malley's testimony was general, vague, conclusory, and incomplete with respect to the terms of the purported $54,400 loan from Kevin O'Malley to petitioners.  His testimony does not establish with respect to that loan, inter alia, (1) the interest rate, (2) the term, (3) the schedule for payments, or (4) whether it was secured.  As a final illustration of why we shall not rely on Mr. O'Malley's testimony regarding the alleged venture, including the purported $54,400 loan, Mr. O'Malley testified that during February 2000 to November 2001 petitioners issued to Kevin O'Malley checks totaling $7,407.40.  Petitioners claim that such checks were payments with respect to the purported $54,400 loan from Kevin O'Malley to petitioners.  Mr. O'Malley did not explain why petitioners made no additional payments with respect to that purported loan until June 3, 2003, the date on which petitioners contend they repaid the purported $54,400 loan.

On the record before us, we find that petitioners have

---

[28]Petitioners do not claim, and the record does not show, that at the time of the December 2, 1999 transaction the alleged venture lent petitioners $200,000 or otherwise distributed such amount to them.

failed to carry their burden of showing, let alone by strong proof, that the December 2, 1999 transaction was some type of venture with respect to lot 5 between Mr. O'Malley and Kevin O'Malley and that, as part of that alleged venture, Kevin O'Malley lent petitioners $54,400 of the $254,400 F&M Bank 1999 loan.

We have found on the record presented that, at all relevant times after the December 2, 1999 transaction, (1) Kevin O'Malley (a) continued to live in the house located on lot 5, (b) ceased paying rent to petitioners with respect to that lot, and (c) made payments to F&M Bank with respect to the $254,400 F&M Bank 1999 loan; and (2) petitioners did not make any payments to F&M Bank with respect to that loan. Moreover, petitioners have failed to carry their burden of showing, let alone by strong proof, that, after the December 2, 1999 transaction, petitioners, and not Kevin O'Malley, (1) were vested with the right of possession with respect to lot 5 or (2) paid the expenses (e.g., real property taxes) with respect to that lot.

On the record before us, we find that petitioners have failed to carry their burden of showing, let alone by strong proof, that, after the December 2, 1999 transaction, they retained the benefits and burdens of ownership with respect to lot 5.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of

establishing, let alone by strong proof, that, at the time of the December 2, 1999 transaction, that transaction was not a sale for tax purposes.

We address next petitioners' argument that, because of events occurring in years after the December 2, 1999 transaction, that transaction became a sale of lot 5 in 1999, but for $200,000 and not for $318,000 as reflected in the December 2, 1999 settlement statement. As discussed above, the determination of whether a purported sale is a sale for tax purposes must be made as of the date of the purported sale.[29] See Derr v. Commissioner, 77 T.C. at 723-724. Any events occurring in years after the December 2, 1999 transaction could not have resulted in a sale in 1999 of lot 5 by petitioners.[30] See id. We reject petitioners' argument that, because of events occurring in years after the December 2, 1999 transaction, that transaction became a sale of lot 5 in 1999, but for $200,000 and not for $318,000 as reflected in the December 2, 1999 settlement statement.

Based upon our examination of the entire record before us, we sustain respondent's determination in the notice that the December 2, 1999 transaction constitutes a sale of lot 5 by petitioners for $318,000.

In the event the Court were to sustain, as the Court has,

---

[29]See supra note 26.

[30]See supra note 26.

respondent's determination that the December 2, 1999 transaction constitutes a sale of lot 5 by petitioners for $318,000, petitioners maintain an alternative position under section 108(e)(5) with respect to that transaction. According to petitioners, the $54,400 check dated June 3, 2003, that petitioners issued to Kevin O'Malley qualifies petitioners for a purchase price reduction (purchase price reduction) under section 108(e)(5) with respect to the December 2, 1999 transaction. In support of that position, petitioners argue that the legislative history of section 108(e)(5) indicates that Congress did not intend for section 108(e)(5) to apply only when the debt of a purchaser to the seller of property is reduced.

Section 108(e)(5) provides:

SEC. 108. INCOME FROM DISCHARGE OF INDEBTEDNESS.

*      *      *      *      *      *      *

(e) General Rules for Discharge of Indebtedness (Including Discharges Not in Title 11 Cases or Insolvency).--For purposes of this  title--

*      *      *      *      *      *      *

(5) Purchase-money debt reduction for solvent debtor treated as price reduction.--If--

(A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced,

(B) such reduction does not occur--

(i) in a title 11 case, or

(ii) when the purchaser is insol-
vent, and

(C) but for this paragraph, such reduc-
tion would be treated as income to the pur-
chaser from the discharge of indebtedness,

then such reduction shall be treated as a
purchase price adjustment.

The language of section 108(e)(5) is plain and unambiguous.

By its terms, section 108(e)(5) applies only when "the debt of a

purchaser of property to the seller of such property which arose

out of the purchase of such property is reduced". Sec.

108(e)(5)(A). We may not resort to the legislative history of

section 108(e)(5), as petitioners urge.[31] See Burlington N. R.R.

Co. v. Okla. Tax Commn., 481 U.S. 454, 461 (1987); Fernandez v.

Commissioner, 114 T.C. 324, 329-330 (2000).

The $54,400 check dated June 3, 2003, that petitioners

issued to Kevin O'Malley did not reduce any debt of Kevin O'Mal-

ley to petitioners. Indeed, petitioners maintain that it was

petitioners who owed $54,400 to Kevin O'Malley as a result of the

December 2, 1999 transaction, not Kevin O'Malley who owed peti-

---

[31]Nor are there any exceptional circumstances warranting our turning for guidance to the legislative history of sec. 108(e)(5). See Burlington N. R.R. Co. v. Okla. Tax Commn., 481 U.S. 454, 461 (1987); Fernandez v. Commissioner, 114 T.C. 324, 329-330 (2000). Nonetheless, it is noteworthy that, consistent with its plain language, the legislative history of sec. 108(e)(5) provides that that section applies only when the debt of a purchaser of property to the seller of such property, which arose out of the purchase of such property, is reduced. See S. Rept. 96-1035 at 16 (1980), 1980-2 C.B. 620, 628.

tioners that amount.

On the record before us, we find that the check dated June 3, 2003, that petitioners issued to Kevin O'Malley for $54,400 does not qualify under section 108(e)(5) as a purchase price reduction of the $318,000 price for the sale of lot 5.[32]

June 14, 2000 Transaction

Petitioners acknowledge that they cast the form of the June 14, 2000 transaction as a sale by petitioners of lot 12 to Edward O'Malley for $225,000. However, it is petitioners' position that that transaction does not constitute a sale for tax purposes. In support of their position, petitioners argue:

> There is no debate in this case as to what tran-
> spired. Shortly after acquiring their home in 1997
> Petitioners endeavored to investigate the subdivision
> and development of the property into lots for resale
> separate from what they desired to retain for their
> residence. When it was determined that the property
> could be subdivided under the Anne Arundel County fam-
> ily conveyance subdivision provisions, Petitioners
> elicited agreements and understandings with * * * Ed-
> ward O'Malley, to accept * * * Lot [12] and as regards
> to Lot No. 12 an agreement and understanding with Ed-
> ward O'Malley to reconvey Lot No. 12 to Petitioners at
> the expiration of the five (5) year holding period.
> Edward O'Malley would not benefit financially from the
> development of Lot No. 12, nor would he assume any of
> the benefits of, or incur any obligations associated
> with, ownership of Lot No. 12. Although Edward O'Mal-
> ley was legally responsible to the Bank to comply with
> the terms and conditions of its first mortgage loan,
> the evidence clearly establishes that Petitioners have
> paid all of the debt service on the mortgage loan in
> accordance with their agreement and understanding that
> Edward O'Malley was only to be an accommodation party

---

[32]See supra note 21.

in the subdivision of Lot No. 12 and the financing derived from said Lot.  Under no circumstances would the seller of property in a bona fide sale pay the purchaser's debt service on the financing obtained by purchaser used to pay the purchase price to seller.

We have found the following facts with respect to the June 14, 2000 transaction.  Although the funds that petitioners received from Kevin O'Malley as a result of the December 2, 1999 transaction enabled them to satisfy certain of their financial obligations, they needed additional funds in order to meet certain other obligations.  Mr. O'Malley asked his brother Edward O'Malley whether he would be willing to accommodate petitioners and enable them to obtain such additional funds.  Edward O'Malley agreed to do so.  To that end, Edward O'Malley and Mr. O'Malley entered into an oral agreement under which:  (1) Petitioners' transfer of lot 12 to Edward O'Malley pursuant to petitioners' family subdivision agreement was to be structured in the form of a sale;[33] (2) Edward O'Malley was to borrow from F&M Bank $180,000, or 80 percent of the estimated $225,000 fair market value of lot 12, and was to secure that loan with that lot; (3) Edward O'Malley was to transfer proceeds of the $180,000 loan to petitioners; (4) petitioners were to make all the payments to F&M Bank required by the terms of the $180,000 loan; (5) the

_____

[33]Edward O'Malley and Mr. O'Malley agreed to structure the transfer of lot 12 as a sale because F&M Bank required such a structure before it was willing to make a loan to Edward O'Malley that was to be secured by that lot.

balance of the estimated $225,000 fair market value of lot 12 (i.e., $45,000) was to be reflected as a loan from petitioners to Edward O'Malley on which Edward O'Malley was not required to make any payments; (6) petitioners were to pay all the expenses relating to lot 12, including all real property taxes; and (7) Edward O'Malley was to retransfer lot 12 to petitioners after a five-year period.

On June 14, 2000, pursuant to the agreement between Edward O'Malley and Mr. O'Malley, (1) petitioners entered into a transaction with Edward O'Malley with respect to lot 12 that was structured in the form of a sale of lot 12 by petitioners to Edward O'Malley; (2) Edward O'Malley borrowed $180,000 from F&M Bank and secured that loan with lot 12; and (3) Edward O'Malley transferred to petitioners all but $8,475 of the $180,000 F&M Bank 2000 loan, or $171,535.[34]

Pursuant to the agreement between Edward O'Malley and Mr. O'Malley, as modified by them when Edward O'Malley agreed to refinance the $180,000 F&M Bank 2000 loan, petitioners made from July 2000 through December 2005 payments totaling $69,538.49 to F&M Bank on the $180,000 F&M Bank 2000 loan or the refinanced F&M Bank 2000 loan. Pursuant to the agreement between Edward O'Malley and Mr. O'Malley, as modified by them when Edward O'Malley agreed to refinance the $180,000 F&M Bank 2000 loan: (1) From

---

[34]See supra note 15.

June 14, 2000, until at least the time of the trial in this case in early 2006, Edward O'Malley did not (a) make any payments to F&M Bank on the $180,000 F&M Bank 2000 loan or the refinanced F&M Bank 2000 loan, (b) make any payments on the second loan with respect to lot 12, or (c) live on lot 12; (2) petitioners paid all the expenses relating to lot 12, including all real property taxes; and (3) sometime after June 14, 2000, and before September 15, 2004, petitioners forgave the second loan with respect to lot 12.

On the record before us, we find that petitioners have carried their burden of showing by strong proof that the form of the June 14, 2000 transaction does not reflect the substance of that transaction. On that record, we further find that petitioners have carried their burden of showing by strong proof that, after the June 14, 2000 transaction, petitioners retained the benefits and burdens of ownership with respect to lot 12.

Based upon our examination of the entire record before us, we find that petitioners have carried their burden of establishing by strong proof that the June 14, 2000 transaction does not constitute a sale for tax purposes. Accordingly, we reject respondent's determination that the June 14, 2000 transaction was a sale of lot 12 for $225,000.

Accuracy-Related Penalty

Respondent determined that petitioners are liable for each of their taxable years 1999 and 2000 for the accuracy-related penalty under section 6662(a) because of: (1) Negligence or disregard of rules or regulations under section 6662(b)(1) or (2) a substantial understatement of tax under section 6662(b)(2).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. See sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. See Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

For purposes of section 6662(b)(2), an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in such return. See

sec. 6662(d)(2)(A). An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the tax return for that year or $5,000. Sec. 6662(d)(1)(A).

The amount of the understatement is to be reduced to the extent that it is attributable to, inter alia, the tax treatment of an item for which there is or was substantial authority. Sec. 6662(d)(2)(B)(i). The substantial authority standard is an objective standard involving an analysis of the law and the application of the law to the relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. In order to satisfy the substantial authority standard of section 6662(d)(2)(B)(i), a taxpayer must show that the weight of the authorities supporting the tax return treatment of an item is substantial in relation to the weight of authorities supporting contrary treatment. See Antonides v. Commissioner, supra at 702; sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is not so stringent that a taxpayer's treatment must be one that is ultimately upheld in litigation or that has a greater than 50-percent likelihood of being sustained in litigation. See sec. 1.6662-4(d)(2), Income Tax Regs. A taxpayer may have substantial authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory provision as applied to the

relevant facts.  See sec. 1.6662-4(d)(3)(ii), Income Tax Regs.
There may be substantial authority for more than one position
with respect to the same item.  See sec. 1.6662-4(d)(3)(i),
Income Tax Regs.

The accuracy-related penalty under section 6662(a) does not
apply to any portion of an underpayment if it is shown that there
was reasonable cause for, and that the taxpayer acted in good
faith with respect to, such portion.  Sec. 6664(c)(1).  The
determination of whether the taxpayer acted with reasonable cause
and in good faith depends on the pertinent facts and circum-
stances, including the taxpayer's effort to assess such tax-
payer's proper tax liability, the knowledge and experience of the
taxpayer, and the reliance on the advice of a professional, such
as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent has the burden of production under section
7491(c) with respect to the accuracy-related penalty under sec-
tion 6662.  To meet that burden, respondent must come forward
with sufficient evidence showing that it is appropriate to impose
the accuracy-related penalty.  Higbee v. Commissioner, 116 T.C.
438, 446 (2001).  Although respondent bears the burden of produc-
tion with respect to the accuracy-related penalty that respondent
determined for each of petitioners' taxable years 1999 and 2000,
respondent "need not introduce evidence regarding reasonable
cause, substantial authority, or similar provisions. * * * the

taxpayer bears the burden of proof with regard to those issues."
Id.

It is petitioners' position that they are not liable for
1999 for the portion of the accuracy-related penalty that is
attributable to their not reporting the December 2, 1999 transac-
tion as a sale in their 1999 return.[35]  In support of their posi-
tion, petitioners argue that there is or was substantial author-
ity for that return position.  Consequently, according to peti-
tioners, if the Court were to sustain respondent's determination
in the notice with respect to the December 2, 1999 transaction,
as the Court has, the understatement of tax attributable to
petitioners' failure to report that transaction as a sale in
their 1999 return should be reduced pursuant to section
6662(d)(2)(B)(i).  In that event, petitioners maintain, there
would be no substantial understatement of tax in their 1999
return within the meaning of section 6662(d)(1)(A).  (We shall
refer to petitioners' argument under section 6662(d) as petition-
ers' substantial authority argument.)

As we understand petitioners' substantial authority argu-

---

[35]Petitioners do not maintain that they are not liable for
1999 for the portion of the accuracy-related penalty under sec.
6662(a) that is attributable to the following determinations that
respondent made for that year and that they do not dispute:
(1) $5,200 increase in petitioners' Schedule C gross receipts and
(2) $1,715 decrease in their claimed Schedule C interest expense.

ment, the application of certain well-established principles[36] to the facts and circumstances surrounding the December 2, 1999 transaction supports the conclusion that that transaction was not a sale of lot 5 when it occurred. Therefore, according to petitioners, they had substantial authority when they filed their 1999 return for not reporting the December 2, 1999 transaction as a sale in that return.[37]

We reject petitioners' substantial authority argument. The problem with that argument is that petitioners have failed to carry their burden of establishing, let alone by strong proof, the facts and circumstances that they contend surrounded the

_____

[36]The well-established principles on which petitioners rely are the principles that we concluded are applicable in determining whether the December 2, 1999 transaction and the June 14, 2000 transaction constitute sales for tax purposes. Those principles are: (1) The key in determining whether a transaction is a sale for tax purposes is whether the benefits and burdens of ownership have passed, Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981); and (2) a taxpayer may attempt to disregard the form of a transaction as not reflective of its substance, but must present strong proof to do so, see Ill. Power Co. v. Commissioner, 87 T.C. 1417, 1434 (1986).

[37]On brief, petitioners appear to suggest at times that they had substantial authority only to support their position with respect to "that part of the [December 2,] 1999 transaction in excess of the $200,000.00 first mortgage loan amount." Thus, petitioners seem to take inconsistent positions on brief with respect to the accuracy-related penalty that respondent determined for 1999. Regardless whether petitioners intend petitioners' substantial authority argument to pertain to the entire December 2, 1999 transaction or to be limited to "that part of the 1999 transaction in excess of the $200,000.00 first mortgage loan amount", for the reasons set forth below, we reject that argument.

December 2, 1999 transaction. We have found on the record presented that petitioners have failed to carry their burden of showing, let alone by strong proof, that the December 2, 1999 transaction was some type of venture with respect to lot 5 between Mr. O'Malley and Kevin O'Malley pursuant to which petitioners claim, inter alia, that Kevin O'Malley lent petitioners $54,400 of the $254,400 F&M Bank 1999 loan. We have further found on that record that, at all relevant times after the December 2, 1999 transaction, (1) Kevin O'Malley (a) continued to live in the house located on lot 5, (b) ceased paying rent to petitioners with respect to that lot, and (c) made payments to F&M Bank with respect to the $254,400 F&M Bank 1999 loan; and (2) petitioners did not make any payments to F&M Bank with respect to that loan. We have also found on the record presented that petitioners have failed to carry their burden of showing, let alone by strong proof, that, after the December 2, 1999 transaction, petitioners, and not Kevin O'Malley, (1) were vested with the right of possession with respect to lot 5 or (2) paid the expenses (e.g., real property taxes) with respect to that lot. Finally, we have found on the record presented that petitioners have failed to carry their burden of showing, let alone by strong proof, that, after the December 2, 1999 transaction, they retained the benefits and burdens of ownership with respect to lot 5. The record simply does not support petitioners' asser-

tion with respect to the December 2, 1999 transaction that "The only rational explanation supported by the record is that the Petitioners were engaged in obtaining financing" with respect to lot 5.

Petitioners do not dispute that if the Court were to reject, as the Court has, petitioners' substantial authority argument, there would be a substantial understatement of tax within the meaning of section 6662(d)(1)(A) for their 1999 taxable year. We conclude that the burden of production under section 7491(c) imposed on respondent with respect to the accuracy-related penalty is satisfied.

Petitioners not only advance petitioners' substantial authority argument in support of their position that they are not liable for 1999 for the portion of the accuracy-related penalty that is attributable to their tax treatment of the December 2, 1999 transaction, they also maintain that they are not liable for such portion of the penalty because they had reasonable cause for, and acted in good faith in, not reporting that transaction as a sale in their 1999 return.

In determining whether a taxpayer acted with reasonable cause and in good faith, generally the most important factor to consider "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners made no effort to ascertain the proper tax

treatment of the December 2, 1999 transaction by, for example, consulting a tax professional.  Petitioners suggest that they made no effort to do so because Mr. O'Malley's education and business background gave him "the necessary knowledge to under-stand that the borrowing of money is not a taxable event".[38] According to petitioners, even if they had consulted a tax pro-fessional with respect to the December 2, 1999 transaction, the professional would have advised them, "after thorough research * * * that substance trumps form and in substance Petitioners engaged merely in financing transactions."

The problem with petitioners' argument under section 6664(c) is the same as the problem with petitioners' substantial author-ity argument under section 6662(d).  That is to say, petitioners have failed to carry their burden of establishing, let alone by strong proof, the facts and circumstances that they contend surrounded the December 2, 1999 transaction.  We have found on the record presented that petitioners have failed to carry their burden of establishing, let alone by strong proof, the facts and

---

[38]In this connection, Mr. O'Malley testified:

It never occurred to me to even have a discussion with
him [petitioners' 1999 and 2000 tax return preparer]
about them [the December 2, 1999 transaction and the
June 14, 2000 transaction] being sales because it was
the furthest thing from my mind that not only would I
be paying all the interest on the loan, but to also
have to pay a tax on the transaction it never struck me
as remotely possible or required.

circumstances that would support petitioners' position that the December 2, 1999 transaction was not a sale of lot 5 but was a financing transaction in which petitioners engaged.[39]

On the record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, the portion of the underpayment for 1999 that is attributable to their failure to report the December 2, 1999

---

[39]Petitioners also contend that they did not receive Form 1099-S that the settlement agent for the December 2, 1999 transaction issued with respect to that transaction and that therefore they were not "on notice" that that transaction was shown in that form and reported to respondent as a sale. Even if, as petitioners claim, they did not receive Form 1099-S with respect to the December 2, 1999 transaction, they received warnings that that transaction was to be shown in Form 1099-S and reported to respondent as a sale. The December 2, 1999 settlement statement stated in pertinent part:

> SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

Moreover, petitioners signed a document that was attached to the December 2, 1999 settlement statement. That document, entitled "ACKNOWLEDGEMENT AND RECEIPT OF SETTLEMENT STATEMENT", provided in pertinent part:

> SELLER(S) further acknowledge that receipt of a copy hereof shall constitute a receipt at closing of IRS Form 1099-S [Proceeds From Real Estate Transactions].

transaction as a sale in their 1999 return.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are not liable for 1999 for the accuracy-related penalty under section 6662(a) because of a substantial understatement of tax under section 6662(b)(2).[40]

We now address respondent's determination in the notice that petitioners are liable for 2000 for the accuracy-related penalty under section 6662(a). We have found that petitioners have sustained their burden of establishing by strong proof that respondent erred in determining that the June 14, 2000 transaction constitutes a sale of lot 12 for $225,000. Consequently, there is no underpayment of tax for 2000 on which the accuracy-related penalty under section 6662(a) may be imposed. On the record before us, we find that petitioners are not liable for 2000 for the accuracy-related penalty.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

---

[40]In light of our finding under sec. 6662(a) and (b)(2), we need not address respondent's argument that petitioners are liable for 1999 for the accuracy-related penalty under sec. 6662(a) because of negligence or disregard of rules or regulations under sec. 6662(b)(1).

To reflect the foregoing,

Decision will be entered under
Rule 155.