T.C. Memo. 2014-104

UNITED STATES TAX COURT

GEORGE B. DOUGLAS, JR., AND PEARL J. DOUGLAS, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5078-12.                    Filed May 29, 2014.

George B. Douglas, Jr., and Pearl J. Douglas, pro sese.

<u>Nathan M. Swingley</u> and <u>Stewart Todd Hittinger</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined deficiencies in, and accuracy-related penalties under section 6662(a)[1] on, petitioners' Federal income tax (tax) as follows:

---

[1]All section references are to the Internal Revenue Code (Code) in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[*2]

| Year | Deficiency | Accuracy-Related Penalty Under Sec. 6662(a) |
|------|-----------|--------------------------------------------|
| 2007 | $35,364 | $7,072.80 |
| 2008 | 49,725 | 9,945.00 |
| 2009 | 25,847 | 5,169.40 |

The issues remaining for decision are:

(1) Do petitioners have a loss that is attributable to Apple Pie Mortgage, LLC, for each of their taxable years 2007, 2008, and 2009? We hold that they do not.

(2) Do petitioners have a loss that is attributable to Douglas & Jenkins, Inc., an S corporation, for each of their taxable years 2007, 2008, and 2009? We hold that they do not.

(3) Do petitioners have certain unreported income of $19,020, $42,111, and $22,210 for their taxable years 2007, 2008, and 2009, respectively, that respondent determined on the basis of the bank deposits method? We hold that they do.

(4) Are petitioners entitled for their taxable year 2008 to the first-time homebuyer credit under section 36(a)? We hold that they are not.

**[*3]** (5) Are petitioners liable for each of their taxable years 2007, 2008, and 2009 for the accuracy-related penalty under section 6662(a)?  We hold that they are.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Indiana at the time they filed the petition.

On November 22, 1999, petitioner Pearl J. Douglas (Ms. Douglas) purchased certain property (Pike Creek property) on Pike Creek Lane in Indianapolis, moved into the house (Pike Creek house) on that property, and resided there until around September 10, 2008.

On April 14, 2002, Ms. Douglas executed a quitclaim deed in which she quitclaimed her interest in the Pike Creek property to her minor children, RB and JB, for "good consideration and for the sum of one Dollar[]".  For a period not established by the record after Ms. Douglas executed the quitclaim deed, she continued to pay all of the expenses associated with the Pike Creek property, including expenses for electricity, trash service, homeowners insurance, and real property taxes.

**[*4]** During the years at issue, petitioners maintained, and had signatory authority over, certain bank accounts (petitioners' bank accounts) at Energy Plus Credit Union and JP Morgan Chase.

During the years at issue, petitioner George B. Douglas, Jr. (Mr. Douglas) worked for Citizens Gas & Coke Utility Trust (Citizens Gas). During those years, Mr. Douglas received wage income from Citizens Gas of $52,652, $52,931, and $54,629, respectively.

During the years at issue, Mr. Douglas owned 50 percent of the stock of Douglas & Jenkins, Inc. (Douglas & Jenkins), an S corporation, that operated a bar and night club in Indianapolis under the name "Club Escalade". During those years, Club Escalade sold alcoholic beverages, nonalcoholic beverages, and food that Douglas & Jenkins had purchased from certain vendors (Club Escalade vendors). On May 9, 2009, Club Escalade was destroyed by a fire and ceased operating as a business.

During the years at issue, Ms. Douglas was the sole member of Apple Pie Mortgage, LLC (Apple Pie Mortgage), which operated a mortgage brokerage business that obtained for its clients conventional loans from various financial institutions as well as loans insured by the Federal Housing Administration (FHA) and the U.S. Department of Veterans Affairs. During those years, the FHA required

[*5] Apple Pie Mortgage to undergo annual independent audits. In order to satisfy that requirement, Apple Pie Mortgage engaged Bauer & Bauer, LLC (Bauer & Bauer), a certified public accounting firm, to perform an independent audit of Apple Pie Mortgage for each of the years at issue. Upon completion of each of those audits, Bauer & Bauer prepared an audit report (collectively, Apple Pie Mortgage audit reports). The Apple Pie Mortgage audit reports showed that Apple Pie Mortgage had (1) "Total Loan revenue" of $100,120, $119,072, and $93,799 and (2) "Total Operating expenses" of $76,930, $86,629, and $68,627 for its taxable years 2007, 2008, and 2009, respectively.

Around September 10, 2008, Mr. Douglas purchased certain property (Lone Tree property) on Lone Tree Court in Indianapolis and moved with Ms. Douglas into the house on that property.

Douglas & Jenkins filed Form 1120S, U.S. Income Tax Return for an S Corporation (Form 1120S), for each of its taxable years 2007 (2007 Form 1120S), 2008 (2008 Form 1120S), and 2009 (2009 Form 1120S). In the 2007 Form 1120S, Douglas & Jenkins reported "Gross receipts or sales" of $70,200 and "Cost of goods sold" of $56,307 and claimed "Total deductions" of $32,587 (2007 claimed Form 1120S deductions) and "Ordinary business income (loss)" of negative $18,694. The 2007 claimed Form 1120S deductions consisted of the following:

[*6]

| Deduction | Amount |
|---|---|
| Interest | $4,687 |
| Depreciation not claimed on Schedule A or elsewhere on return | 8,959 |
| Accounting | 600 |
| Insurance | 3,492 |
| Laundry and cleaning | 183 |
| Security | 600 |
| Supplies | 1,459 |
| Telephone | 1,208 |
| Utilities | 10,877 |
| Trash service | 522 |
| Total | 32,587 |

In the 2008 Form 1120S, Douglas & Jenkins reported "Gross receipts or sales" of $91,308 and "Cost of goods sold" of $74,899 and claimed "Total deductions" of $28,539 (2008 claimed Form 1120S deductions) and "Ordinary business income (loss)" of negative $12,130. The 2008 claimed Form 1120S deductions consisted of the following:

[*7]

| Deduction | Amount |
|---|---|
| Depreciation not claimed on Schedule A or elsewhere on return | $8,052 |
| Accounting | 600 |
| Insurance | 3,350 |
| Laundry and cleaning | 240 |
| Security | 1,391 |
| Telephone | 1,451 |
| Utilities | 12,167 |
| Trash service | 1,288 |
| Total | 28,539 |

In the 2009 Form 1120S, Douglas & Jenkins reported "Gross receipts or sales" of $31,997 and "Cost of goods sold" of $37,847 and claimed "Total deductions" of $14,756 (2009 claimed Form 1120S deductions) and "Ordinary business income (loss)" of negative $20,606. The 2009 claimed Form 1120S deductions consisted of the following:

[*8]

| Deduction | Amount |
|---|---|
| Depreciation not claimed on Schedule A or elsewhere on return | $7,146 |
| Dues and subscriptions | 191 |
| Insurance | 2,122 |
| Telephone | 858 |
| Utilities | 4,439 |
| Total | 14,756 |

Petitioners filed joint tax returns for their taxable years 2007 (2007 return), 2008 (2008 return), and 2009 (2009 return). In the 2007 return, petitioners showed the address of the Pike Creek property as their home address. In that return, petitioners reported "Wages, salaries, tips, etc." of $52,652, "Taxable interest" of $1,075, "Business income or (loss)" of negative $36,231, and "total income" of $17,496.

In the 2008 return, petitioners reported "Wages, salaries, tips, etc." of $52,931, "Taxable interest" of $1,863, "Business income or (loss)" of negative $34,737, "Other income" of $2,260, and "total income" of $16,192. In that return, petitioners also claimed a first-time homebuyer credit of $7,500 with respect to the Lone Tree property.

**[\*9]** In the 2009 return, petitioners reported "Wages, salaries, tips, etc." of $54,629, "Taxable interest" of $219, "Business income or (loss)" of negative $33,387, and "total income" of negative $3,237.

Petitioners included Schedule C, Profit or Loss From Business (Schedule C), with respect to Mr. Douglas' 50 percent ownership of Douglas & Jenkins (Douglas & Jenkins Schedule C) with each of the 2007 return (2007 Douglas & Jenkins Schedule C), the 2008 return (2008 Douglas & Jenkins Schedule C), and the 2009 return (2009 Douglas & Jenkins Schedule C). Petitioners also included Schedule C with respect to Ms. Douglas' sole ownership of Apple Pie Mortgage (Apple Pie Mortgage Schedule C) with each of the 2007 return (2007 Apple Pie Mortgage Schedule C), the 2008 return (2008 Apple Pie Mortgage Schedule C), and the 2009 return (2009 Apple Pie Mortgage Schedule C).

In the 2007 Douglas & Jenkins Schedule C, petitioners reported "Gross receipts or sales" of $70,200 and "Cost of goods sold" of $56,307 and claimed "Total expenses" of $40,847 (2007 Douglas & Jenkins claimed Schedule C expenses). The 2007 Douglas & Jenkins claimed Schedule C expenses consisted of the following:

[*10]

| Expense | Amount |
|---|---|
| Advertising | $350 |
| Car and truck expenses | 6,637 |
| Contract labor | 4,000 |
| Depreciation and sec. 179 expense deduction | 1,137 |
| Interest | 4,687 |
| Repairs and maintenance | 895 |
| Supplies | 6,334 |
| Taxes and licenses | 2,400 |
| Utilities | 14,407 |
| Total | 40,847 |

The 2007 Douglas & Jenkins claimed Schedule C expenses are not equal to 50 percent of the "Total deductions" that Douglas & Jenkins claimed in the 2007 Form 1120S.

In the 2007 Apple Pie Mortgage Schedule C, petitioners reported "Gross receipts or sales" of $39,724 (2007 Apple Pie Mortgage reported Schedule C gross receipts) and claimed "Total expenses" of $48,570 (2007 Apple Pie Mortgage claimed Schedule C expenses) and "Expenses for business use of your home" of

[*11] $431. The 2007 Apple Pie Mortgage claimed Schedule C expenses

consisted of the following:

| Expense | Amount |
| --- | --- |
| Advertising | $3,800 |
| Car and truck expenses | 3,845 |
| Depreciation and sec. 179 expense deduction | 850 |
| Legal and professional services | 3,600 |
| Rent or lease | 10,800 |
| Supplies | 21,150 |
| Taxes and licenses | 600 |
| Travel, meals, and entertainment | 825 |
| Utilities | 3,100 |
| Total | 48,570 |

In the 2008 Douglas & Jenkins Schedule C, petitioners reported "Gross re-

ceipts or sales" of negative $6,065 (2008 Douglas & Jenkins reported Schedule C

gross receipts) and claimed "Total expenses" of $19,709 (2008 Douglas & Jenkins

claimed Schedule C expenses). The 2008 Douglas & Jenkins claimed Schedule C

expenses consisted of the following:

[*12]

| Expense | Amount |
|---|---|
| Car and truck expenses | $5,509 |
| Repairs and maintenance | 5,500 |
| Supplies | 2,800 |
| Travel, meals, and entertainment | 1,800 |
| Utilities | 4,100 |
| Total | 19,709 |

The respective 2008 Douglas & Jenkins reported Schedule C gross receipts and the 2008 Douglas & Jenkins claimed Schedule C expenses are not equal to 50 percent of the "Gross receipts or sales" that Douglas & Jenkins reported and 50 percent of the "Total deductions" that it claimed in the 2008 Form 1120S.

In the 2008 Apple Pie Mortgage Schedule C, petitioners reported "Gross receipts or sales" of $24,895 (2008 Apple Pie Mortgage reported Schedule C gross receipts) and claimed "Total expenses" of $32,715 (2008 Apple Pie Mortgage claimed Schedule C expenses) and "Expenses for business use of your home" of $1,143. The 2008 Apple Pie Mortgage claimed Schedule C expenses consisted of the following:

[*13]

| Expense | Amount |
|---|---|
| Car and truck expenses | $4,065 |
| Legal and professional services | 3,600 |
| Rent or lease | 10,200 |
| Supplies | 10,100 |
| Taxes and licenses | 1,800 |
| Utilities | 2,950 |
| Total | 32,715 |

In the 2009 Douglas & Jenkins Schedule C, petitioners reported no "Gross receipts or sales" and claimed "Total expenses" of $12,545 (2009 Douglas & Jenkins claimed Schedule C expenses). The 2009 Douglas & Jenkins claimed Schedule C expenses consisted of the following:

| Expense | Amount |
|---|---|
| Car and truck expenses | $7,345 |
| Utilities | 5,200 |
| Total | 12,545 |

The 2009 Douglas & Jenkins claimed Schedule C expenses are not equal to 50 percent of the "Total deductions" that Douglas & Jenkins claimed in the 2009 Form 1120S.

[*14] In the 2009 Apple Pie Mortgage Schedule C, petitioners reported "Gross receipts or sales" of $27,255 (2009 Apple Pie Mortgage reported Schedule C gross receipts) and claimed "Total expenses" of $45,799 (2009 Apple Pie Mortgage claimed Schedule C expenses) and "Expenses for business use of your home" of $2,298. The 2009 Apple Pie Mortgage claimed Schedule C expenses consisted of the following:

| Expense | Amount |
| --- | --- |
| Car and truck expenses | $6,164 |
| Legal and professional services | 4,500 |
| Rent or lease | 12,300 |
| Supplies | 16,735 |
| Taxes and licenses | 2,900 |
| Utilities | 3,200 |
| Total | 45,799 |

Petitioners also included Schedule E, Supplemental Income and Loss (Schedule E), with each of the 2008 return (2008 Schedule E) and the 2009 return (2009 Schedule E). In the 2008 Schedule E, petitioners reported "Total rental real estate and royalty income or (loss)" of negative $6,125 with respect to the Pike Creek property.

[*15] In the 2009 Schedule E, petitioners reported "Rents received" of $5,400 and "Total rental real estate and royalty income or (loss)" of negative $14,395 with respect to the Pike Creek property. In that Schedule E, petitioners also reported a nonpassive loss of $10,303 that is attributable to Douglas & Jenkins (2009 claimed Douglas & Jenkins loss). The 2009 claimed Douglas & Jenkins Schedule E loss was shown in Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc., that Mr. Douglas received from Douglas & Jenkins for his taxable year 2009 and was equal to 50 percent of the loss of $20,606 that Douglas & Jenkins claimed in the 2009 Form 1120S.

Around June of 2010, respondent commenced an examination of petitioners' 2008 return (respondent's examination). Respondent later expanded that examination to include petitioners' 2007 return and 2009 return.

During respondent's examination, petitioners provided respondent's revenue agent assigned to that examination with, inter alia, (1) the Apple Pie Mortgage audit reports and (2) general ledgers (Apple Pie Mortgage general ledgers) that Ms. Douglas maintained for Apple Pie Mortgage for 2007, 2008, and 2009, respectively. The revenue agent examined the Apple Pie Mortgage audit reports and the Apple Pie Mortgage general ledgers and determined that the respective amounts of "Total Loan revenue" and "Total Operating expenses" for 2007, 2008,

[*16] and 2009 that were shown in the Apple Pie Mortgage audit reports were essentially the same as the respective total amounts of gross receipts and expenses for those years that were shown in the Apple Pie Mortgage general ledgers.  On the basis of his review of the information in the Apple Pie Mortgage audit reports and the Apple Pie Mortgage general ledgers, the revenue agent concluded that Apple Pie Mortgage has gross receipts of $120,746,[2] $119,072, and $93,799[3] and expenses totaling $55,527, $52,825, and $46,954[4] for 2007, 2008, and 2009,

---

[2]As discussed below, the determinations that respondent made in the notice of deficiency (notice) with respect to Apple Pie Mortgage for 2007 are based on the revenue agent's conclusion that Apple Pie Mortgage has gross receipts of $120,746 for that year.

[3]The respective amounts of gross receipts that the revenue agent concluded Apple Pie Mortgage has for 2007, 2008, and 2009 are greater than the respective amounts of the 2007 Apple Pie Mortgage reported Schedule C gross receipts, the 2008 Apple Pie Mortgage reported Schedule C gross receipts, and the 2009 Apple Pie Mortgage reported Schedule C gross receipts.  (We shall refer to the respective differences between (1) the gross receipts of $120,746 that the revenue agent concluded Apple Pie Mortgage has for 2007 and the 2007 Apple Pie Mortgage reported Schedule C gross receipts of $39,724, i.e., $81,022, as the 2007 Apple Pie Mortgage unreported gross receipts, (2) the gross receipts of $119,072 that the revenue agent concluded Apple Pie Mortgage has for 2008 and the 2008 Apple Pie Mortgage reported Schedule C gross receipts of $24,895, i.e., $94,177, as the 2008 Apple Pie Mortgage unreported gross receipts, and (3) the gross receipts of $93,799 that the revenue agent concluded Apple Pie Mortgage has for 2009 and the 2009 Apple Pie Mortgage reported Schedule C gross receipts of $27,255, i.e., $66,544, as the 2009 Apple Pie Mortgage unreported gross receipts.)

[4]The respective total amounts of expenses that the revenue agent concluded

(continued...)

[*17] respectively.  Thus, according to the revenue agent, Apple Pie Mortgage has net income of $65,219, $66,247, and $46,845 for 2007, 2008, and 2009, respectively.

As part of respondent's examination, the revenue agent asked petitioners for (1) certain documents pertaining to petitioners' 2007 return, petitioners' 2008 return, and petitioners' 2009 return and (2) the respective books and records of Douglas & Jenkins for its taxable years 2007, 2008, and 2009.  Petitioners did not provide the revenue agent with those documents and books and records.  Consequently, the revenue agent issued summonses on behalf of respondent (respondent's summonses) to (1) the respective banks at which petitioners maintained petitioners' bank accounts and (2) the Club Escalade vendors.  Pursuant to respon-

[4](...continued)
Apple Pie Mortgage has for 2007, 2008, and 2009 are greater than the respective amounts of the 2007 Apple Pie Mortgage claimed Schedule C expenses, the 2008 Apple Pie Mortgage claimed Schedule C expenses, and the 2009 Apple Pie Mortgage claimed Schedule C expenses.  However, those respective total amounts of expenses are less than the respective total amounts of expenses shown for Apple Pie Mortgage for 2007, 2008, and 2009 in the Apple Pie Mortgage audit reports and the Apple Pie Mortgage general ledgers.  In determining the total amount of expenses shown in the Apple Pie Mortgage audit reports and the Apple Pie Mortgage general ledgers for each of the years 2007, 2008, and 2009 that the revenue agent allowed as deductions for each of those years, the revenue agent did not allow deductions for certain of those expenses for each of the years 2007, 2008, and 2009 that he concluded were not "reasonable, ordinary and necessary", such as clothing, marketing gifts, gasoline, and vehicle repairs.

**[*18]** dent's summonses, those banks provided the revenue agent with the bank statements for the respective bank accounts that petitioners maintained during 2007, 2008, and 2009 (petitioners' bank statements), and those vendors provided the revenue agent with invoices for the alcoholic beverages, nonalcoholic beverages, and food that Douglas & Jenkins purchased for Club Escalade during 2007, 2008, and 2009, respectively (Club Escalade invoices).

The revenue agent examined petitioners' bank statements and prepared respective bank deposits analyses for petitioners' taxable years 2007, 2008, and 2009 on the basis of that examination (respondent's bank deposits analyses). Those respective bank deposits analyses showed, inter alia, the total amount of deposits into each of petitioners' bank accounts during each month in 2007, 2008, and 2009. In preparing respondent's bank deposits analyses, the revenue agent attempted to ascertain whether any of the deposits into petitioners' bank accounts during 2007, 2008, and 2009 is nontaxable because, for example, a deposit had been made as a result of a transfer of funds from one of petitioners' bank accounts to another of those accounts.

For petitioners' taxable year 2007, the revenue agent reduced the total deposits into petitioners' bank accounts by (1) all deposits that the revenue agent concluded are nontaxable, (2) the "Wages, salaries, tips, etc." of $52,652 that peti-

[*19] tioners reported in the 2007 return, (3) the "Taxable interest" of $1,075 that petitioners reported in the 2007 return, (4) the 2007 Apple Pie Mortgage reported Schedule C gross receipts of $39,724, and (5) the 2007 Apple Pie Mortgage unreported gross receipts of $81,022.[5] The revenue agent concluded that the balance of the total deposits, i.e., $19,020, constituted unreported income for petitioners' taxable year 2007.

For petitioners' taxable year 2008, the revenue agent reduced the total deposits into petitioners' bank accounts by (1) all deposits that the revenue agent concluded are nontaxable, (2) the "Wages, salaries, tips, etc." of $52,931 that petitioners reported in the 2008 return, (3) the "Taxable interest" of $1,863 that petitioners reported in the 2008 return, (4) the "Other income" of $2,260 that petitioners reported in the 2008 return, (5) the 2008 Apple Pie Mortgage reported Schedule C gross receipts of $24,895, and (6) the 2008 Apple Pie Mortgage unreported gross receipts of $94,177.[6] The revenue agent concluded that the balance of the

---

[5]The revenue agent had already included the 2007 Apple Pie Mortgage unreported gross receipts in the Schedule C gross receipts of Apple Pie Mortgage for 2007.

[6]The revenue agent had already included the 2008 Apple Pie Mortgage unreported gross receipts in the Schedule C gross receipts of Apple Pie Mortgage for 2008.

[*20] total deposits, i.e., $42,111, constituted unreported income for petitioners' taxable year 2008.

For petitioners' taxable year 2009, the revenue agent reduced the total deposits into petitioners' bank accounts by (1) all deposits that the revenue agent concluded are nontaxable, (2) the "Wages, salaries, tips, etc." of $54,629 that petitioners reported in the 2009 return, (3) the "Taxable interest" of $219 that petitioners reported in the 2009 return, (4) the 2009 Apple Pie Mortgage reported Schedule C gross receipts of $27,255, (5) the "Rents received" of $5,400 that petitioners reported in the 2009 Schedule E, and (6) the 2009 Apple Pie Mortgage unreported gross receipts of $66,544.[7] The revenue agent concluded that the balance of the total deposits, i.e., $22,210, constituted unreported income for petitioners' taxable year 2009.

The revenue agent also examined the Club Escalade invoices and prepared respective percentage markup analyses for Douglas & Jenkins for its taxable years 2007, 2008, and 2009 on the basis of that examination (respondent's percentage markup analyses). In preparing respondent's percentage markup analyses, the revenue agent first determined Douglas & Jenkins' cost of goods sold for each of its

---

[7]The revenue agent had already included the 2009 Apple Pie Mortgage unreported gross receipts in the Schedule C gross receipts of Apple Pie Mortgage for 2009.

[*21] taxable years 2007, 2008, and 2009 by (1) adding to the beginning inventory that Douglas & Jenkins reported in Form 1120S that it filed for each of those taxable years the purchases that it made during each such year pursuant to the Club Escalade invoices and (2) subtracting the ending inventory that it reported for each of those taxable years in each such Form 1120S. The revenue agent determined Douglas & Jenkins' gross receipts and expenses for each of its taxable years 2007, 2008, and 2009 by multiplying the cost of goods sold that it determined Douglas & Jenkins has for each of those taxable years by certain percentages determined by the respective ratios of (a) cost of goods sold to gross receipts and (b) expenses to gross receipts that were shown for similar businesses on a Web site known as BizStats.[8]

For Douglas & Jenkins' taxable year 2007, the revenue agent determined that Douglas & Jenkins has gross receipts of $150,794, cost of goods sold of $59,790, "Gross Profit" of $91,004, and expenses of $80,358. The revenue agent further determined (1) that the difference between the "Gross Profit" of $91,004 and the expenses of $80,358 that he determined Douglas & Jenkins has for its tax-

---

[8]According to its Web site, BizStats collects and analyzes public data to provide a free online source for small business statistics. See BizStats, http://www.bizstats.com (follow "About" hyperlink) (last visited April 1, 2014). The Brandow Co. owns and operates BizStats. Id.

[*22] able year 2007, i.e., $10,646, constituted "Ordinary Income" of Douglas & Jenkins for that taxable year and (2) that Mr. Douglas' 50 percent share of that "Ordinary Income" for that taxable year was $5,323.

For Douglas & Jenkins' taxable year 2008, the revenue agent determined that Douglas & Jenkins has gross receipts of $126,620, cost of goods sold of $50,205, "Gross Profit" of $76,415, and expenses of $67,476. The revenue agent further determined (1) that the difference between the "Gross Profit" of $76,415 and the expenses of $67,476 that he determined Douglas & Jenkins has for its taxable year 2008, i.e., $8,939, constituted "Ordinary Income" of Douglas & Jenkins for that taxable year and (2) that Mr. Douglas' 50 percent share of that "Ordinary Income" for that taxable year was $4,470.

For Douglas & Jenkins' taxable year 2009, the revenue agent determined that Douglas & Jenkins has gross receipts of $78,124, cost of goods sold of $30,976, "Gross Profit" of $47,148, and expenses of $41,632. The revenue agent further determined (1) that the difference between the "Gross Profit" of $47,148 and the expenses of $41,632 that he determined Douglas & Jenkins has for its taxable year 2009, i.e., $5,516, constituted "Ordinary Income" of Douglas & Jenkins for that taxable year and (2) that Mr. Douglas' 50 percent share of that "Ordinary Income" for that taxable year was $2,758.

[*23] Respondent issued to petitioners a notice for their taxable years 2007, 2008, and 2009. In that notice, respondent determined that petitioners have unreported Schedule C gross receipts that are attributable to Apple Pie Mortgage of $25,495, $41,352, and $19,590 for their taxable years 2007, 2008, and 2009, respectively. Respondent also determined in the notice to disallow all of the expenses that petitioners claimed in the respective Schedules C for Apple Pie Mortgage that they attached to their 2007 return, their 2008 return, and their 2009 return.[9] The determinations that respondent made in the notice with respect to Apple Pie Mortgage resulted in petitioners' having net income that is attributable to that company of

_____

[9]During respondent's examination, the revenue agent concluded that Apple Pie Mortgage has increased gross receipts of $120,746, $119,072, and $93,799 and increased expenses of $55,527, $52,825, and $46,954 for 2007, 2008, and 2009, respectively. Thus, according to the revenue agent, petitioners have net income that is attributable to Apple Pie Mortgage of $65,219, $66,247, and $46,845 for their taxable years 2007, 2008, and 2009, respectively. As discussed in the text, respondent made determinations in the notice with respect to Apple Pie Mortgage that also resulted in petitioners' having net income that is attributable to that company of $65,219, $66,247, and $46,845 for their taxable years 2007, 2008, and 2009, respectively. However, respondent made those determinations in a bizarre manner. Instead of increasing the gross receipts that petitioners reported and the expenses that petitioners claimed that are attributable to Apple Pie Mortgage for their taxable years 2007, 2008, and 2009, respectively, respondent determined in the notice to disallow all of those claimed expenses and increase those reported gross receipts by amounts that are significantly less than the amount by which the revenue agent increased those reported gross receipts for each of petitioners' taxable years 2007, 2008, and 2009.

**[*24]** $65,219, $66,247, and $46,845 for their taxable years 2007, 2008, and 2009, respectively.

In the notice, respondent determined that petitioners should not have reported gross receipts and/or claimed expenses that are attributable to Douglas & Jenkins in Schedule C for each of their taxable years 2007, 2008, and 2009.[10] Respondent further determined that petitioners should have reported in Schedule E net income that is attributable to Douglas & Jenkins of $5,323, $4,470, and $2,758 for their taxable years 2007, 2008, and 2009, respectively.[11] The net income that is attributable to Douglas & Jenkins that respondent determined in the notice petitioners have for their respective taxable years 2007 and 2008 is the same as the net

---

[10]It is unclear why petitioners reported gross receipts and/or claimed expenses that are attributable to Douglas & Jenkins in Schedule C for each of their taxable years 2007, 2008, and 2009 when petitioners were required to report claimed net income or a claimed loss that is attributable to Douglas & Jenkins in Schedule E for each of those years. As discussed in the text, they reported a claimed loss of $10,303 that is attributable to Douglas & Jenkins in the 2009 Schedule E and a claimed loss of $12,545 in the 2009 Douglas & Jenkins Schedule C.

[11]In support of respondent's determinations with respect to Douglas & Jenkins, respondent stated in the notice: "It is determined that the loss flow-through from your S Corporation, Douglas & Jenkins DBA Club Escalade is $5,323.00, $4,470.00 and $13,061.00". That statement is incorrect insofar as it refers to any "loss flow-through from * * * Douglas & Jenkins". As made clear elsewhere in the notice, respondent determined that petitioners have unreported net income of $5,323, $4,470, and $2,758 that is attributable to Douglas & Jenkins for the respective taxable years at issue.

[*25] income that is attributable to that corporation that the revenue agent concluded petitioners have for those respective years. The net income that is attributable to Douglas & Jenkins that respondent determined in the notice petitioners have for their taxable year 2009 is also the same as the net income that is attributable to that corporation that the revenue agent concluded petitioners have for that year.[12]

In the notice, respondent further determined that for their taxable years 2007, 2008, and 2009 petitioners have unreported income of $20,285, $44,395, and $22,210, respectively.[13]

---

[12]However, respondent made the determination of petitioners' net income of $2,758 that is attributable to Douglas & Jenkins for their taxable year 2009 in a bizarre manner. See supra note 9. In the notice, respondent did not disallow the nonpassive loss of $10,303 that petitioners claimed in the 2009 Schedule E is attributable to Douglas & Jenkins. Instead, respondent determined to increase "Sch E-Inc/Loss-Prtnrship/S Corps-Passve/Non-Passve" by $13,061, which resulted in petitioners' having net income that is attributable to Douglas & Jenkins of $2,758 for their taxable year 2009, the same amount that the revenue agent concluded they have for that taxable year.

[13]In making the determination that for their taxable years 2007, 2008, and 2009 petitioners have unreported income of $20,285, $44,395, and $22,210, respectively, respondent relied on respondent's bank deposits analyses that the revenue agent had prepared. In this connection, respondent conceded at the trial in this case that for their respective taxable years 2007 and 2008 petitioners have unreported income of $19,020 and $42,111 as the revenue agent concluded on the basis of respondent's bank deposits analyses, and not $20,285 and $44,395 as respondent determined in the notice.

**[*26]** Respondent also determined in the notice that petitioners (1) are not entitled for their taxable year 2008 to the first-time homebuyer credit under section 36(a)[14] and (2) are liable for each of their taxable years 2007, 2008, and 2009 for the accuracy-related penalty under section 6662(a).

## OPINION

Petitioners bear the burden of establishing that the determinations in the notice that remain at issue are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and petitioners bear the burden of proving entitlement to any deduction claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The Code and the regulations thereunder required petitioners to maintain records sufficient to establish the amount of any deduction claimed. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

We turn initially to the issue presented with respect to Apple Pie Mortgage. As we understand petitioners' position, petitioners maintain that they have a loss

---

[14]In the notice, respondent determined to increase petitioners' tax for their taxable year 2008 by $7,800 as a result of respondent's determination that petitioners are not entitled for their taxable year 2008 to the first-time homebuyer credit under sec. 36(a). Petitioners claimed a first-time homebuyer credit of $7,500, and not $7,800, for their taxable year 2008. Respondent's error in the notice should be corrected in the computations under Rule 155 that will be required in order for us to enter a decision in this case.

[*27] that is attributable to Apple Pie Mortgage for each of their taxable years 2007, 2008, and 2009, not net income for each of those years as respondent determined in the notice.[15]

Except for certain uncorroborated testimony of Ms. Douglas at trial, petitioners presented no evidence establishing that they have a loss that is attributable to Apple Pie Mortgage for each of their taxable years 2007, 2008, and 2009. We shall not rely on the uncorroborated testimony of Ms. Douglas to establish petitioners' position that they have losses that are attributable to Apple Pie Mortgage for those respective years. See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they did not have net income that is attributable to Apple Pie Mortgage of $65,219, $66,247, and $46,845 for their taxable years 2007, 2008, and 2009, respectively.

We turn next to the issue presented with respect to Douglas & Jenkins. As we understand petitioners' position, petitioners maintain that they have a loss that is attributable to Douglas & Jenkins for each of their taxable years 2007, 2008,

---

[15]Although given the opportunity to do so, petitioners did not file any briefs in this case. Our understanding of petitioners' position is based upon their pretrial memorandum and their respective testimonies at the trial in this case.

**[*28]** and 2009, not net income for each of those years as respondent determined in the notice.[16]

Except for certain uncorroborated testimony of Mr. Douglas at trial, petitioners presented no evidence establishing that they have a loss that is attributable to Douglas & Jenkins for each of their taxable years 2007, 2008, and 2009. We shall not rely on the uncorroborated testimony of Mr. Douglas to establish petitioners' position that they have losses that are attributable to Douglas & Jenkins for those respective years. See, e.g., Tokarski v. Commissioner, 87 T.C. at 77.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they did not have net income that is attributable to Douglas & Jenkins of $5,323, $4,470, and $2,758 for their taxable years 2007, 2008, and 2009, respectively.[17]

---

[16]See supra note 15.

[17]Assuming arguendo that we had found that petitioners had losses that are attributable to Douglas & Jenkins for their taxable years 2007, 2008, and 2009, respectively, petitioners would be entitled to deduct those losses only to the extent of the sum of Mr. Douglas' adjusted basis in his stock of Douglas & Jenkins and his adjusted basis in any indebtedness of that corporation to him. See sec. 1366(d)(1)(A) and (B). Petitioners did not introduce any evidence to establish Mr. Douglas' adjusted basis in his stock of Douglas & Jenkins and his adjusted basis in any indebtedness of that corporation to him.

[*29] We turn next to whether petitioners have certain unreported income for each of their taxable years 2007, 2008, and 2009 that respondent determined on the basis of the bank deposits method. As we understand petitioners' position, petitioners maintain that they do not.[18]

Except for certain uncorroborated testimony of Ms. Douglas at trial, petitioners presented no evidence establishing that they do not have the unreported income that respondent determined on the basis of the bank deposits method for each of their taxable years 2007, 2008, and 2009. We shall not rely on the uncorroborated testimony of Ms. Douglas to establish petitioners' position that they do not have that unreported income for those respective taxable years. See, e.g., id.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they did not have the unreported income that respondent determined on the basis of the bank deposits method of $19,020, $42,111, and $22,210 for their taxable years 2007, 2008, and 2009, respectively.

We turn now to the first-time homebuyer credit under section 36(a) that petitioners are claiming for their taxable year 2008. It is petitioners' position that they are entitled to that credit for their taxable year 2008 with respect to the Lone

---

[18]See supra note 15.

**[\*30]** Tree property.[19]  In support of that position, petitioners rely on the testimony of Ms. Douglas that "[n]either one of us [petitioners] owned a home" since 2002.

As pertinent here, an individual taxpayer who is a first-time homebuyer of a principal residence in the United States is entitled to a credit in an amount equal to 10 percent of the purchase price of the principal residence, sec. 36(a), but such amount is not to exceed $7,500, sec. 36(b)(1)(A).  As pertinent here, the credit is applicable only if the taxpayer "purchased" the principal residence on or after April 9, 2008, and before July 1, 2009.  Sec. 36(h).

The term "first-time homebuyer" is defined in section 36(c)(1) to mean "any individual if such individual (and if married, such individual's spouse) had no present ownership interest in a principal residence during the 3-year period ending on the date of the purchase of the principal residence to which this section applies."

Respondent acknowledges that "petitioner George B. Douglas, Jr. will qualif[y] as a first-time homebuyer" within the meaning of section 36(c)(1).  However, respondent maintains that petitioners are not entitled for their taxable year 2008 to the first-time homebuyer credit with respect to the Lone Tree property because

---

[19]See supra note 15.

**[*31]** Ms. Douglas does not qualify as a first-time homebuyer within the meaning of that section. According to respondent:

> The evidence supports that Pearl J. Douglas retained the benefits and burdens of ownership [of the Pike Creek property], in fact, she never relinquished them after the quitclaim deed. Even after the legal transfer, she continued to reside in the property and she maintained and paid the property's insurance, electric and trash expenses, and property taxes. * * * Even after [q]uitclaiming her interest, petitioners reported rental activity for this property on a Schedule E in 2008 and 2009. Because Pearl Douglas retained the benefits and burdens of ownership, for purposes of section 36(c) she never relinquished equitable ownership in the Pike Creek property. [Citations omitted.]

On April 14, 2002, Ms. Douglas executed a quitclaim deed with respect to the Pike Creek property to RB and JB. However, that fact is not determinative of whether Ms. Douglas transferred ownership of the Pike Creek property to RB and JB for tax purposes. To determine whether Ms. Douglas had an ownership interest in that property after she executed a quitclaim deed with respect to it to RB and JB, we will examine all the facts and circumstances. Cf. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981).[20] No single factor is controlling, and the focus of our inquiry is on whether the benefits and burdens of ownership have shifted. Id. Among the factors that we consider in determining whether the benefits and burdens of ownership have shifted are: (1) whether legal title

---

[20]See also O'Malley v. Commissioner, T.C. Memo. 2007-79.

[*32] passes, (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. Id. at 1237-1238.

After Ms. Douglas executed the quitclaim deed, she continued to reside in the Pike Creek house on the Pike Creek property until around September 10, 2008, and continued to pay the expenses associated with the Pike Creek property, including expenses for electricity, trash service, homeowners insurance, and real property taxes. In addition, she and Mr. Douglas reported (1) "Total rental real estate and royalty income or (loss)" of negative $6,125 with respect to the Pike Creek property in the 2008 Schedule E and (2) "Rents received" of $5,400 and "Total rental real estate and royalty income or (loss)" of negative $14,395 with respect to the Pike Creek property in the 2009 Schedule E. Those actions are consistent with Ms. Douglas' having retained the benefits and burdens of ownership of the Pike Creek property after she executed a quitclaim deed with respect to that property to RB and JB.

**[\*33]** On the record before us, we find that Ms. Douglas retained the benefits and burdens of ownership of the Pike Creek property after she executed the quitclaim deed and had a present ownership interest in the Pike Creek property during the three-year period that ended on September 10, 2008, the date on which Mr. Douglas purchased the Lone Tree property. On the record before us, we find that Ms. Douglas does not qualify as a "first-time homebuyer" within the meaning of section 36(c)(1).

Based upon our examination of the entire record before us, we find that petitioners are not entitled for their taxable year 2008 to the first-time homebuyer credit under section 36(a).

We turn next to the issue presented under section 6662(a). Section 6662(a) imposes an accuracy-related penalty of 20 percent on the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. See <u>Leuhsler v. Commissioner</u>, 963 F.2d 907, 910 (6th Cir. 1992),

[*34] aff'g T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990).  The term "negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  The term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).

For purposes of section 6662(b)(2) an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the return.  Sec. 6662(d)(2)(A).  An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the tax return for that year or $5,000.  Sec. 6662(d)(1)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends on all the pertinent facts and circumstances, including the taxpayer's efforts to assess the taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.

**[*35]** Reliance on the advice of a professional may demonstrate reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id. In this connection, a taxpayer must demonstrate that the taxpayer's reliance on the advice of a professional concerning substantive tax law was objectively reasonable. See Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), aff'g T.C. Memo. 1993-480. A taxpayer's reliance on the advice of a professional will be objectively reasonable only if the taxpayer has provided necessary and accurate information to the professional. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

Respondent bears the burden of production with respect to the accuracy-related penalties under section 6662(a) that respondent determined in the notice. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To satisfy respondent's burden of production, respondent must come forward with "sufficient evidence indicating that it is appropriate to impose" the penalty. Higbee v. Commissioner, 116 T.C. at 446. Although respondent bears the burden of production with respect to the penalty under section 6662(a), respondent "need

**[*36]** not introduce evidence regarding reasonable cause * * * or similar provisions. * * * the taxpayer bears the burden of proof with regard to those issues." Id.

Respondent argues that petitioners are liable for each of the years at issue for the accuracy-related penalty under section 6662(a) because of a substantial understatement of tax under section 6662(b)(2) and petitioners' negligence or disregard of rules or regulations under section 6662(b)(1).

On the record before us, we find that respondent has satisfied respondent's burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662(a).[21]

As we understand petitioners' position, they maintain that under section 6664(c)(1) they had reasonable cause for, and acted in good faith with respect to, the respective underpayments for their taxable years 2007, 2008, and 2009.[22] In support of that position, petitioners rely on the following testimony of Ms. Douglas (Ms. Douglas' section 6662(a) testimony):

---

[21]For example, petitioners failed to substantiate properly the respective losses for each of their taxable years 2007, 2008, and 2009 that they claim are attributable to Apple Pie Mortgage and Douglas & Jenkins. See sec. 1.6662-3(b)(1), Income Tax Regs.

[22]See supra note 15.

**[*37]** Again, my thing was, I thought we did the due diligence thing by going and having our returns revised to show that we did not earn --and the money that they're saying, as well as we did not, at the end of the year, have a profit--

*    *    *    *    *    *    *

So I--my objection to the penalty is that even though you're saying that, you know, we didn't prove it to the Court and doing the revised returns did not benefit us. I really--I guess that leaves me in a position I did not prove my case. But I thought we did do the right thing, I thought we was in our--within the law to be entitled. I feel like we were entitled to be able to file our revised returns

And if so, we would not have had to come to Tax Court. And I know you're saying that now that we're here we have to prove to you, so that--you know, I have to accept that. But I feel like had we been able to not be misled by the IRS as to not being able to file the revised returns, we would have--our accountant, the CPA, would have filed our 1040X. It would have supported the fact that we did not intentonally understate-- [Reproduced literally.]

On the record before us, we find that Ms. Douglas' section 6662(a) testimony does not establish that there was reasonable cause for, and that petitioners acted in good faith with respect to, the respective underpayments for their taxable years 2007, 2008, and 2009. On the record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, those underpayments.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are not liable for

**[\*38]** each of their taxable years 2007, 2008, and 2009 for the accuracy-related penalty under section 6662(a).

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing, the concessions of the parties, and a certain error that we found in the notice, see supra note 14,

Decision will be entered under

Rule 155.